1  KEKER, VAN NEST & PETERS LLP
   STEVEN P. RAGLAND - # 221076
2  sragland@keker.com
   NICHOLAS D. MARAIS - # 277846
3  nmarais@keker.com
   W. HAMILTON JORDAN - # 295004
4  wjordan@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendant COINBASE, INC.

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10 SAN FRANCISCO DIVISION

11 | ABRAHAM BIELSKI, on behalf of himself | Case No. 3:21-cv-07478-WHA
   | and all others similarly situated, |
12 | | **DEFENDANT COINBASE, INC.'S**
   | Plaintiff, | **MOTION TO COMPEL INDIVIDUAL**
13 | | **ARBITRATION AND TO STAY;**
   | v. | **MEMORANDUM OF POINTS AND**
14 | | **AUTHORITIES IN SUPPORT THEREOF**
   | COINBASE, INC., |
15 | | Date:    March 10, 2022
   | Defendant. | Time:    8:00 a.m.
16 | | Dept.:   Courtroom 12 – 19th Floor
   | | Judge:   Hon. William Alsup
17
   Date Filed: September 24, 2021
18
   Trial Date: None set
19

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I. INTRODUCTION .................................................................................................................1

II. STATEMENT OF ISSUES TO BE DECIDED ...................................................................2

III. BACKGROUND ..................................................................................................................2

IV. LEGAL STANDARD...........................................................................................................4

V. ARGUMENT.........................................................................................................................5

    A. Mr. Bielski accepted the User Agreement, which clearly and unmistakably delegates "gateway" arbitration questions to the arbitrator. ...................................5

    B. The User Agreement is valid, enforceable, and encompasses Mr. Bielski's claims. .......................................................................................................................7

        1. Mr. Bielski and Coinbase consented to final and binding individual arbitration by agreeing to the User Agreement............................................7

        2. The User Agreement is presumptively valid and enforceable. ....................8

        3. Mr. Bielski's claims fall within the scope of the arbitration clause.............8

    C. The action should be stayed pending the completion of Mr. Bielski's individual arbitration proceedings. .......................................................................11

VI. CONCLUSION...................................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................................................................8

*AT&T Techs., Inc. v. Commc'n Workers of Am.*,
475 U.S. 643 (1986) ................................................................................................................7

*Berk v. Coinbase, Inc.*,
840 F. App'x 914 (9th Cir. 2020) .........................................................................................10

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ............................................................................................5, 6

*Britt v. ContextLogic, Inc.*,
No. 20-cv-04333-WHA, 2021 WL 1338553 (N.D. Cal. Apr. 9, 2021) ...................................6

*BrowserCam, Inc. v. Gomez, Inc.*,
No. 08-cv-02959-WHA, 2009 WL 210513 (N.D. Cal. Jan. 27, 2009) ..................................11

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ................................................................................................5

*Circuit City Stores, Inc. v. Adams*,
279 F.3d 889 (9th Cir. 2002) ..................................................................................................7

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) (per curiam) ............................................................................................4

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ....................................................................................7

*Epic Sys., Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ............................................................................................................8

*Gerlach v. Tickmark Inc.*,
No. 21-cv-02768-YGR, 2021 WL 3191692 (N.D. Cal. July 28, 2021) ..................................6

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ..............................................................................................................5, 8

*Green Tree Fin. Corp. v. Randolph*,
531 U.S. 79 (2000) ..................................................................................................................8

*Ingalls v. Spotify USA, Inc.*,
No. 16-cv-03533 WHA, 2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) ............................6, 7

*Kiskadee Commc'ns (Bermuda), Ltd. v. Father*,
  No. 10-cv-05277-WHA, 2011 WL 1044241 (N.D. Cal. Mar. 22, 2011) .................................11

*Levin v. Caviar, Inc.*,
  146 F. Supp. 3d 1146 (N.D. Cal. 2015) ..............................................................................7, 8

*McLellan v. Fitbit, Inc.*,
  No. 16-cv-00036-JD, 2017 WL 4551484 (N.D. Cal. Oct. 11, 2017) .......................................6

*McLellan v. Fitbit, Inc.*,
  No. 16-cv-00036-JD, 2018 WL 1913832 (N.D. Cal. Jan. 24, 2018) .......................................7

*Mohamed v. Uber Techs., Inc.*,
  848 F.3d 1201 (9th Cir. 2016) .................................................................................................6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) .....................................................................................................................8

*Nghiem v. NEC Elec., Inc.*,
  25 F.3d 1437 (9th Cir. 1994) ...................................................................................................7

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) .................................................................................................7

*Norman v. Uber Techs., Inc.*,
  No. 20-cv-06700-JSW, 2021 WL 4497870 (N.D. Cal. Apr. 14, 2021) ...................................7

*Oracle Am., Inc. v. Myriad Grp., A.G.*,
  724 F.3d 1069 (9th Cir. 2013) .................................................................................................6

*Peter v. DoorDash, Inc.*,
  445 F. Supp. 3d 580 (N.D. Cal. 2020) .....................................................................................7

*Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*,
  218 F.3d 1085 (9th Cir. 2000) .................................................................................................4

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ...................................................................................................................5

*Ribeiro v. Sedgwick LLP*,
  No. 16-cv-04507 WHA, 2016 WL 6473238 (N.D. Cal. Nov. 2, 2016) ...................................6

*Shearson/Am. Express, Inc. v. McMahon*,
  482 U.S. 220 (1987) .................................................................................................................8

*United States v. Sutcliffe*,
  505 F.3d 944 (9th Cir. 2007) ...................................................................................................4

*Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) .................................................................................................................5

**Federal Statutes**

9 U.S.C. § 2 ............................................................................................................................ *passim*

9 U.S.C. § 3 ................................................................................................................................6, 11

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 10, 2022 at 8:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable William Alsup, located in Courtroom 12, 19th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Coinbase, Inc. ("Coinbase") will and hereby does move this Court (1) to compel individual arbitration of Plaintiff Abraham Bielski's claims and (2) to stay this action pending completion of those arbitration proceedings.

Coinbase submits this Motion under the Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA") and Federal Rule of Civil Procedure 12(b)(1), based on Mr. Bielski's agreement to individual arbitration with Coinbase when agreeing to the Coinbase User Agreement. This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the accompanying Declaration of Carter McPherson-Evans and the exhibits attached thereto, the pleadings and other documents on file in this case, all other matters of which the Court may take judicial notice, and any further argument or evidence that may be received by the Court at the hearing.

Dated: January 13, 2022

KEKER, VAN NEST & PETERS LLP

By: */s/ Nicholas D. Marais*
STEVEN P. RAGLAND
NICHOLAS D. MARAIS
W. HAMILTON JORDAN

Attorneys for Defendant COINBASE, INC.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

When Plaintiff Abraham Bielski created his Coinbase account in April 2021, he expressly agreed to Coinbase's User Agreement.  In so doing, Mr. Bielski made two commitments relevant to this motion.  First, he agreed that "any dispute … arising out of or relating to" either the User Agreement or Coinbase's services "*shall* be resolved through binding arbitration, on an individual basis."  See Ex. A ("UA"), § 8.3 (emphasis added).[1]  Second, he agreed, in a section headed "CLASS ACTION WAIVER," that any and all claims "must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class…."  *Id.*  Now, despite those clear agreements, Mr. Bielski has filed this action in federal court, purportedly on behalf of a nationwide class.

There can be no dispute that his alleged claims "aris[e] out of or relat[e] to" the User Agreement or Coinbase's services.  Mr. Bielski asserts, for instance, that he was the victim of an "unauthorized electronic transfer," *see* Dkt. 22 ("SAC"), ¶ 13, and it is the UA that explains what steps users should take in the event of unauthorized transfers, *see* UA at § 3.7.  His three causes of action—federal statutory claims—are premised on the UA.  *See* SAC ¶ 22 (alleging that Coinbase provides "a hosted Digital Currency wallet," "[a]s stated in Coinbase's User Agreement").  And his central claim is in fact *about* the company's dispute-resolution process, which is set out in the UA.  *See id.* ¶ 13 (alleging that, after his account was hacked, Coinbase did not do enough "to attempt to resolve the dispute, one way or another").

Mr. Bielski could and should have pursued his claims in arbitration—because he agreed to do so, because the parties delegated questions about arbitrability to the arbitrator, and because, in any event, his claims clearly "arise under" and "relate to" the User Agreement and Coinbase's services.  Coinbase respectfully requests that the Court order Mr. Bielski to do only that which he previously promised to do—submit this dispute to individual arbitration.

---

[1] A true and correct copy of the April 9, 2021 User Agreement accepted by Mr. Bielski is attached as Exhibit A to Coinbase's contemporaneously filed Request for Judicial Notice.

## II.     STATEMENT OF ISSUES TO BE DECIDED

This motion raises two issues: (1) whether the Court should compel arbitration of Mr. Bielski's claims on an individual basis, including by allowing the arbitrator to decide any threshold questions regarding arbitrability; and (2) whether the Court should stay this action pending completion of that arbitration.

## III.    BACKGROUND

Coinbase operates a platform that allows Coinbase account holders to buy and sell various digital and fiat currencies, which can also be stored in users' electronic "wallets."  SAC ¶ 1.

Plaintiff Abraham Bielski created his Coinbase account in April 2021 using the Coinbase mobile app.  *See* Declaration of Carter McPherson-Evans ("Coinbase Decl.") ¶ 7; *id.* Ex. 1. When he did so, he was required to—and did—agree to the Coinbase User Agreement.  *Id.* ¶¶ 8–10; *id.* Exs. 1–2.  In April 2021, as today, any user who created a Coinbase account was required to follow certain in-app steps and procedures.  First, prospective customers must download the Coinbase mobile app onto their mobile devices.  *Id.* ¶ 8.  Second, after opening the app, the new user must provide their first and last name and email address, and must create a password.  *Id.* Then, before proceeding any further, new users **must** check a box to confirm that they agree to be bound by Coinbase's User Agreement and Privacy Policy:



*Id.*; *id.* Ex. 2.

In the mobile app, the words "User Agreement" and "Privacy Policy" are hyperlinked; by clicking on those links, users can view the documents in their entirety.  *Id.* ¶ 8.  In other words, to

create an account, every prospective user—including Mr. Bielski—must first confirm that they agree to Coinbase's User Agreement. *Id.* ¶ 9. It was and is impossible for a customer to set up an account, or to use any of Coinbase's services, without expressly indicating that they so agree. Should a prospective user decline to check the box, they will not be able to create an account. *Id.*

Although Mr. Bielski alleges that he created his account in May 2021, *see* SAC ¶ 12,[2] Coinbase's records show that he did so on April 10, 2021—and that, at that time, he confirmed that he "accepted [the] user agreement":

| | |
|---|---|
| User | Abraham Bielski |
| Performing User | -- |
| Device | -- |
| User Agent | |
| IP Address | 73.224.9.148 |
| Location | Not Available |
| Source | api |
| Application | |
| Action | accepted_user_agreement |
| Created | 2021-04-10 1:32 PM PDT |

*See* Coinbase Decl. ¶ 7; *id.* Ex. 1.

When Mr. Bielski created his Coinbase account in April 2021, the User Agreement then in effect included the following section titled "**Arbitration; Waiver of Class Action**":

> **If we cannot resolve the dispute through the Formal Complaint Process, you and we agree that any dispute arising out of or relating to this Agreement or the Coinbase Services, including, without limitation, federal and state statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation, or any other legal theory, shall be resolved through binding arbitration, on an individual basis (the "Arbitration Agreement") …. Arbitration shall be conducted in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes…. (accessible at https://www.adr.org/sites/default/files/Consumer%20Rules.pdf). This Arbitration Agreement includes, without limitation, disputes arising out of or**

---

[2] The distinction is immaterial, because even if Mr. Bielski had opened his account in May 2021, he would have been required to (and would have) agreed to the same version of the User Agreement. *See* Coinbase Decl. ¶ 13.

> **related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement. All such matters shall be decided by an arbitrator and not by a court or judge.**

UA § 8.3.[3] The User Agreement also makes clear, in separate paragraph titled "Class Action Waiver," that:

> **BY AGREEING TO THESE TERMS, YOU AND COINBASE ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**

*Id.*

## IV. LEGAL STANDARD

The User Agreement's arbitration clause is governed by the Federal Arbitration Act ("FAA"), which applies to "any written provision in a 'contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract.'" *Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*, 218 F.3d 1085, 1089 (9th Cir. 2000) (quoting 9 U.S.C. § 2). The term "involving commerce" is the "functional equivalent of the more familiar term 'affecting commerce,'" which represents the "broadest permissible exercise of Congress' Commerce Clause Power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam) (citation omitted).

Here, the alleged transactions involved interstate commerce, as evidenced by the fact that Mr. Bielski, who is a resident of Florida, SAC ¶ 10, contracted to do business over the Internet with Coinbase, a Delaware corporation with its principal place of business in California, *id.* ¶ 11. Moreover, where the underlying transactions involve the use of Internet technologies to transfer digital currencies, the "involving commerce" requirement has necessarily been satisfied. *See United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce.") (internal quotation marks and citation omitted). Accordingly, the FAA governs the User Agreement's arbitration clause.

The FAA commands that a written contractual provision to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

---

[3] The arbitration provisions cited in this Motion remain the same in the current version of Coinbase's UA. *See* Coinbase Decl. ¶ 14.

revocation of any contract." 9 U.S.C. § 2. The Supreme Court has repeatedly emphasized that the FAA creates a strong, liberal federal policy that favors arbitration. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). Against that backdrop, this Court's role in deciding Coinbase's motion to compel individual arbitration is a narrow one. "[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation omitted). Generally, the Court examines two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and … (2) whether the agreement encompasses the dispute at issue." *Id.* But where, as here, the parties have "clearly and unmistakably" delegated questions of arbitrability to the arbitrator, the Court's role is further limited to determining the effectiveness of the delegation clause itself. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015).

V.   **ARGUMENT**

Mr. Bielski agreed to Coinbase's User Agreement, which requires that his claims be submitted to and resolved by an arbitrator. Indeed, because the UA expressly delegates all "gateway" arbitration questions to the arbitrator—including questions about the enforceability or scope of the arbitration agreement itself—this Court need not evaluate whether the UA is valid, or whether its arbitration clause encompasses Mr. Bielski's claims. But, even if this Court were to reach those questions, controlling law would require it to compel arbitration here.

> A.   **Mr. Bielski accepted the User Agreement, which clearly and unmistakably delegates "gateway" arbitration questions to the arbitrator.**

It is well established that parties may agree to delegate to an arbitrator "gateway" questions about the existence of an arbitration agreement and the scope of that agreement. Such a delegation clause is "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

Delegation clauses are enforceable when they "clearly and unmistakably delegate[] arbitrability questions to the arbitrator." *Brennan*, 796 F.3d at 1132; *see also Oracle Am., Inc. v. Myriad Grp., A.G.*, 724 F.3d 1069, 1072–73 (9th Cir. 2013) (same).

Here, the User Agreement that Mr. Bielski accepted, *see* Section III, *supra*, contains an express delegation clause:

> **This Arbitration Agreement includes, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement. All such matters shall be decided by an arbitrator and not by a court or judge.**

UA § 8.3. This delegation of authority forecloses any question that the arbitrator, and not this Court, must resolve gateway questions about the scope or enforceability of the arbitration clause in the UA. *See Britt v. ContextLogic, Inc.*, No. 20-cv-04333-WHA, 2021 WL 1338553, at *6 (N.D. Cal. Apr. 9, 2021) (holding that comparable language in another consumer arbitration contract "clearly and unmistakably delegates to the arbitrator the authority to decide the enforceability or validity of the arbitration agreement").[4] For this reason alone, the Court should

---

[4] What's more, the parties also incorporated the AAA Consumer Arbitration Rules into the User Agreement. Those rules—and specifically Rule 14(a)—make clear that it is the *arbitrator* who has "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* UA, § 8.3 ("Arbitration shall be conducted in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes…." (emphasis removed)). Courts in this circuit have routinely held that incorporation of AAA or JAMS rules is sufficient evidence that the parties intended to delegate questions of arbitrability to the arbitrator. *See, e.g.*, *Brennan*, 796 F.3d at 1130; *see also Oracle America*, 724 F.3d at 1074 ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Ribeiro v. Sedgwick LLP*, No. 16-cv-04507 WHA, 2016 WL 6473238, at *2 (N.D. Cal. Nov. 2, 2016) (finding "no dispute" that the underlying arbitration agreement "clearly and unmistakably delegated the issue of arbitrability to arbitration by incorporating the JAMS Comprehensive Arbitration Rules and Procedures"). Coinbase recognizes that this Court has previously held that *Brennan* might not extend to cases in which the relevant "consumer contracts involv[e] at least one unsophisticated party." *Ingalls v. Spotify USA, Inc.*, No. 16-cv-03533 WHA, 2016 WL 6679561, at *3 (N.D. Cal. Nov. 14, 2016). But other courts in this district and circuit have reached different conclusions. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1207-09 (9th Cir. 2016) (upholding delegation clause with no discussion of or attention to the parties' level of sophistication); *McLellan v. Fitbit, Inc.*, No. 16-cv-00036-JD, 2017 WL 4551484, at *2 (N.D. Cal. Oct. 11, 2017) (The "greater weight of authority has concluded that the holding of *Opus Bank* applies similarly to non-sophisticated parties."); *Gerlach v. Tickmark Inc.*, No. 21-cv-02768-YGR, 2021 WL 3191692, at *4 (N.D. Cal. July 28, 2021) (same). In any event, this case is quite different from *Ingalls* because, here, there is no doubt that the parties agreed to delegation: the User Agreement specifically says so. *Cf.*

6
COINBASE, INC.'S MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
Case No. 3:21-cv-07478-WHA
1774060

refer this case to AAA for arbitration.

**B.      The User Agreement is valid, enforceable, and encompasses Mr. Bielski's claims.**

**1.      Mr. Bielski and Coinbase consented to final and binding individual arbitration by agreeing to the User Agreement.**

"[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted), and state contract law controls whether the parties have agreed to arbitrate a dispute. *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (citation omitted). An arbitration agreement need only be in writing, and no signature by either party is necessary. *See* FAA, 9 U.S.C. § 2; *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994) ("While the FAA requires a writing, it does not require that the writing be signed by the parties.") (internal quotation marks and citation omitted).

Under California law, "mutual assent is the key to contract formation." *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (*citing Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999)). Here, Mr. Bielski agreed to the User Agreement by checking the verification box and affirmatively tapping "Create account" on the registration page in the Coinbase mobile app indicating his acceptance of the UA. *See* Coinbase Decl. ¶¶ 8–10; *id.* Ex. 1; *id.* Ex. 2. This constitutes a classic "clickwrap" contract, "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). "[C]ourts routinely find [clickwrap agreements] valid and enforceable because the user must affirmatively acknowledge receipt of the terms of the contract." *McLellan v. Fitbit, Inc.*, No. 16-cv-00036-JD, 2018 WL 1913832, at *2 (N.D. Cal. Jan. 24, 2018); *see also Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1157 (N.D. Cal. 2015) (finding that contract was formed "when the plaintiff clicked on a button to indicate assent to an agreement in which the terms themselves were accessed by hyperlink") (citation omitted); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 582 (N.D. Cal. 2020) (enforcing

---

*Ingalls*, 2016 WL 6679561 at *3; *see also Norman v. Uber Techs., Inc.*, No. 20-cv-06700-JSW, 2021 WL 4497870, at *3 (N.D. Cal. Apr. 14, 2021) (distinguishing *Norman* from *Ingalls* because the *Norman* agreement "includes a clear delegation clause and does not suggest that there are issues reserved for judicial determination").

7

arbitration agreement where users were presented with hyperlinked terms and notified that, "[b]y tapping Sign Up … you agree to our Terms and Conditions").  This makes good sense, because "courts have long upheld contracts where the consumer is prompted to examine terms of sale that are located somewhere else." *Levin*, 146 F. Supp. 3d at 1157 (internal quotation marks omitted).  Coinbase has submitted clear evidence that Mr. Bielski accepted the UA by checking the verification box and clicking "Create account" before creating his Coinbase account.  *See* Coinbase Decl. ¶¶ 7–10; *id.* Ex. 1; *id.* Ex. 2.  By so doing, he expressly assented to the UA and is bound by its arbitration clause.

### 2.   The User Agreement is presumptively valid and enforceable.

Arbitration agreements governed by the FAA are presumed valid and enforceable.  *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987).  This reflects Congress's intent behind the FAA: to reverse longstanding judicial hostility toward arbitration and evince a "liberal federal policy favoring arbitration agreements." *See Gilmer*, 500 U.S. at 25 (citations omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  The FAA therefore mandates enforcement of an arbitration clause unless grounds exist "at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Likewise, the Supreme Court has held that class-action waivers, like the one in the User Agreement, are enforceable under the FAA.  *See Epic Sys., Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

To the extent Mr. Bielski contends that the UA and its arbitration terms are invalid and unenforceable, he will bear the high burden of both invalidating the delegation provision *and* of proving that his claims are unsuitable for arbitration.  *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91–92 (2000).  He has made no such claims in his Second Amended Complaint.  If he does so in opposition to this Motion, Coinbase will address his arguments on reply.

### 3.   Mr. Bielski's claims fall within the scope of the arbitration clause.

Mr. Bielski and Coinbase agreed to arbitrate any claims that arise out of *or* relate to the UA *or* the "Coinbase Services," which are defined broadly as "the services provided by Coinbase."  UA, Preamble.

     Mr. Bielski's three claims all fall within the scope of that arbitration clause because each arises out of or relates to Coinbase's provision of services to its users. Specifically, Mr. Bielski alleges that he and the putative class members were victims of "unauthorized transfers" from their Coinbase accounts (accounts that are, under the UA, "services provided by Coinbase") and that Coinbase failed to undertake various remedial measures in response. In his first claim, he alleges that Coinbase "failed to timely and in good faith investigate" unauthorized transfers from Coinbase accounts held by the putative class members. SAC ¶ 27; *see also id.* ¶ 28 (claiming that Coinbase "has failed to timely correct" the transfers, whether "by timely crediting or provisionally recrediting" users' accounts). In his second claim, he alleges that Coinbase "fail[ed] to timely provide information or clarification concerning electronic fund transfers" from the putative class members' Coinbase accounts. *Id.* ¶ 35. Lastly, Mr. Bielski contends in his third claim that, prior to "the first electronic transfer [was] made" from the putative Class Members' Coinbase wallets, Coinbase was allegedly required to provide various disclosures pursuant to Regulation E of the Electronic Fund Transfer Act ("EFTA"). *See id.* ¶¶ 38–39. In other words, these are claims about services Coinbase did or (in Mr. Bielski's view) should have provided. Because all three claims focus on Coinbase's conduct, and its provision of services to Coinbase users, they plainly "relat[e] to … the Coinbase Services" and are therefore subject to individual arbitration. *See* UA, § 8.3.

     Moreover, although not necessary, the claims *also* "relat[e] to th[e] Agreement" itself. For instance, Mr. Bielski alleges that he was "hacked" when an "unauthorized" user transferred funds from one "electronic wallet" to another. *See* SAC ¶ 2. This allegation plainly "relat[es]" to the UA, which contemplates and governs Coinbase's provision of digital wallet accounts for its users, *see* UA, § 2 ("Wallet and Custodial Services"); *id.* § 2.1 ("As part of your Coinbase Account, Coinbase will provide qualifying users access to … a hosted Digital Currency wallet(s) for holding Digital Currencies…."). Moreover, the UA expressly identifies the possibility that "unauthorized" transfers might occur and makes clear that Coinbase's users must "maintain[] adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys or other codes that you use to access the Coinbase Services," because

"[a]ny loss or compromise of the foregoing information and/or your personal information may result in unauthorized access to your Coinbase Account(s) by third-parties and the loss or theft of any Digital Currency and/or funds held in your Coinbase Account(s) and any associated accounts…." *Id.*, § 7.12; *see also id.* ("We assume no responsibility for any loss that you may sustain due to compromise of account login credentials due to no fault of Coinbase and/or failure to follow or act on any notices or alerts that we may send to you.").

Elsewhere, Mr. Bielski complains that Coinbase "failed" to take adequate steps when he and others "actually or constructively reported" unauthorized transactions. SAC ¶ 29. These allegations, too, "relat[e] to" the UA, which imposes reporting obligations on Coinbase's users with respect to unauthorized transactions. *See* UA, § 3.7 ("We are not responsible for any claim for unauthorized or incorrect transactions unless you have notified us in accordance with this section."); *id.* ("When a … transaction occurs using your credentials, we will assume that you authorized such transaction, unless you notify us otherwise.").

Indeed, the core legal theory underpinning Mr. Bielski's entire case—that the 1978 EFTA somehow applies to Coinbase—specifically relies on provisions of the UA itself. *See* SAC ¶ 22 ("Coinbase is a 'financial institution' as defined by the EFTA because it is a corporation that holds accounts belonging to consumers, including Class Members' accounts. As stated in Coinbase's User Agreement, Coinbase provides users with "(a) 'a hosted Digital Currency wallet(s) for holding Digital Currencies ('Digital Currency Wallet'), and (b) a hosted US Dollars ('USD') wallet for holding USD (a 'USD Wallet')." UA, § 2.1.

In short, Mr. Bielski's claims "aris[e] under" the UA. *See Berk v. Coinbase, Inc.*, 840 F. App'x 914, 915 (9th Cir. 2020) (reversing district court and holding that the plaintiffs' claims against Coinbase are subject to arbitration) ("We have held that a claim 'arises under' an agreement when it 'relat[es] to the interpretation and performance of the contract itself.'" (quoting *Tracer Rsch. Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994)). For these reasons, Mr. Bielski's claims are subject to binding, individual arbitration.

    **C.    The action should be stayed pending the completion of Mr. Bielski's individual arbitration proceedings.**

When a dispute covered under an arbitration clause is brought in a suit in federal court, the court must stay the action upon application of any of the parties. 9 U.S.C. § 3. Where, as here, the issues in the case are within the reach of the arbitration agreement, the district court has no discretion to deny a stay. *See Kiskadee Commc'ns (Bermuda), Ltd. v. Father*, No. 10-cv-05277-WHA, 2011 WL 1044241, at *2 (N.D. Cal. Mar. 22, 2011) (if "the parties agreed to arbitrate the dispute at issue" and no "legal constraints external to the arbitration agreement foreclose arbitration of that dispute," then "the court must direct the parties to submit to arbitration and stay the proceedings") (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985)); *BrowserCam, Inc. v. Gomez, Inc.*, No. 08-cv-02959-WHA, 2009 WL 210513, at *3 (N.D. Cal. Jan. 27, 2009) ("A motion to stay … is mandatory and must be granted as to all matters within the scope of the arbitration agreement."). Coinbase requests that the Court stay this action under Section 3 of the FAA.

## VI.    CONCLUSION

For the reasons set forth herein, Coinbase respectfully requests that the Court (1) compel Mr. Bielski to arbitrate his claims on an individual basis and (2) stay this action pending completion of the arbitration.

Dated: January 13, 2022　　　　　　　　　　　　　　　KEKER, VAN NEST & PETERS LLP

　　　　　　　　　　　　　　　　　　　　　　　　　　By:　*/s/ Nicholas D. Marais*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　STEVEN P. RAGLAND
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　NICHOLAS D. MARAIS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　W. HAMILTON JORDAN

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant COINBASE, INC.