1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Matthew D. Carlson (State Bar No. 273242)
mdcarlson@mdcarlsonlaw.com
LAW OFFICE OF MATTHEW D. CARLSON
3959 N. Buffalo Road, Suite 29
Orchard Park, NY 14127
Telephone: (716) 242-1234

Attorney for Plaintiff ABRAHAM BIELSKI

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

ABRAHAM BIELSKI, on behalf of himself and all others similarly situated,

Plaintiff,

v.

COINBASE, INC.

Defendant.

**Case No.: 3:21-cv-07478-WHA**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

Date:     March 10, 2022
Time:    8:00 a.m.
Judge:   Hon. William H. Alsup
Ctrm.:   12 – 19th Floor

Complaint Filed: September 24, 2021

### TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 3

    A.    PLAINTIFF'S COINBASE EXPERIENCE ............................................... 3

    B.    COINBASE'S DISPUTE RESOLUTION PROCEDURE ........................... 5

        1.    The Three-Step Dispute Resolution Procedure .................................... 5

        2.    The Delegation Provision ...................................................................... 7

        3.    The Class Waiver ................................................................................... 7

        4.    Other Relevant Terms of the User Agreement ...................................... 7

III.  LEGAL STANDARD ........................................................................................... 8

IV.   ARGUMENT ........................................................................................................ 8

    A.    THE DELEGATION PROVISION IS UNENFORCEABLE BECAUSE IT IS
        PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE ................. 9

        1.    The Delegation Provision is a Procedurally Unconscionable Contract of
            Adhesion ................................................................................................ 9

        2.    The Delegation Provision is Substantively Unconscionable ........................ 11

            i.    The Delegation Provision is Substantively Unconscionable Because
                It Can Only Be Triggered by a User's Dispute ..................................... 11

            ii.   The Delegation Provision is Substantively Unconscionable Because
                the Prearbitration Process Offers Coinbase a Unilateral "Free Peek"
                at Users' Claims .................................................................................... 14

        3.    The Delegation Provision Cannot be Saved by Modifying the Language
            of the Provision or by Severing Unconscionable Terms .............................. 16

    B.    THE LARGER AGREEMENT TO ARBITRATE IS UNENFORCEABLE FOR
        ESSENTIALLY THE SAME REASONS THAT THE DELEGATION
        PROVISION IS UNENFORCEABLE ................................................................. 18

    C.    THE CLASS WAIVER CANNOT SURVIVE INDEPENDENT OF THE
        ARBITRATION PROVISION ............................................................................ 19

    D.    ALTERNATIVELY, COINBASE'S MOTION SHOULD BE DENIED
        BECAUSE COINBASE DID NOT ATTEMPT TO RESOLVE PLAINTIFF'S
        DISPUTE IN GOOD FAITH AS REQUIRED BY THE DRP ............................ 22

V.    CONCLUSION ................................................................................................... 24

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION
Case No. 3:21-cv-07478-WHA

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abramson v. Juniper Networks, Inc.*,
115 Cal.App.4th 638 (2004) ........................................................................... 11

*Arellano v. T-Mobile USA, Inc.*,
No. C 10-05663 WHA, 2011 WL 1362165 (N.D. Cal. Apr. 11, 2011) ................... 10

*Armendariz v. Found. Health Psychcare Services*, Inc.,
24 Cal. 4th 83 (2000) ................................................................ 1, 11, 17, 18

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 346 (2011) ...................................................................................... 10

*Bakersfield Coll. v. California Cmty. Coll. Athletic Assn.*,
41 Cal. App. 5th 753 (2019) .......................................................................... 13

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ...................................................................... 8, 9

*Brice v. Haynes Invs., LLC*,
13 F.4th 823 (9th Cir. 2021) ......................................................................... 8, 9

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
622 F.3d 996 (9th Cir. 2010) ......................................................................... 10

*Capili v. Finish Line, Inc.*,
116 F. Supp. 3d 1000 (N.D. Cal. 2015), *aff'd*, 699 F. App'x 620 (9th Cir. 2017) ............... 18

*Carver v. JFK Memorial Hospital, Inc.*,
2020 WL 6269268 (Cal.App. 4 Dist., 2020) .......................................... 2, 16, 17, 18

*Darrah v. Friendly Ice Cream Corp.*,
328 F.Supp.2d 319 (N.D.N.Y. 2004) ................................................... 2, 22, 23

*Dunham v. Env't Chemical Corp.*,
No. C 06-03389 JSW, 2006 WL 2374703 (N.D. Cal. Aug. 16, 2006) ...........passim

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ................................................................................... 21

*Figueredo-Chavez V. RCI Hospitality Holdings, Inc.*,
2021 WL 5763577 (S.D. Fla. Dec. 3, 2021) ................................................... 21

*Flores v. Transamerica HomeFirst, Inc.*,
93 Cal. App. 4th 846 (2001) .......................................................................... 14

*Foley v. Interactive Data Corp.*,
765 P.2d 373 (Cal. 1988) ............................................................................... 23

*Gonzalez v. Mission Am. Ins. Co.*,
795 S.W.2d 734 (Tex. 1990) .......................................................................... 20

*Gonzalez v. Preferred Freezer Servs., LBF, LLC*,
2012 WL 2602653 (C.D. Cal. July 5, 2012) .................................................. 14

ii

*Harris v. Tap Worldwide, LLC*,
  248 Cal. App. 4th 373 (2016) ............................................................................................ 18

*In re Juul Labs, Inc., Antitrust Litigation*,
  2021 WL 3675208 (N.D. Cal., Aug. 19, 2021) .................................................................... 9

*In re Rivers*,
  2010 WL 5375950 (Bankr. S.D. Miss. Dec. 22, 2010) ................................................ 20, 22

*Jimenez v. Menzies Aviation Inc.*,
  No. 15-CV-02392-WHO, 2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ............................. 4

*John Wiley & Sons, Inc. v. Livingston*,
  376 U.S. 543 (1964) ........................................................................................................... 23

*Kinney v. United HealthCare Servs., Inc.*,
  70 Cal. App. 4th 1322 (1999) ............................................................................................ 13

*Klink v. ABC Phones Of North Carolina, Inc.*,
  No. 20-CV-06276-EMC, 2021 WL 3709167 (N.D. Cal. Aug. 20, 2021) ............................ 17

*Lang v. Skytap, Inc.*,
  347 F. Supp. 3d 420 (N.D. Cal. 2018) ............................................................................... 18

*Lhotka v. Geographic Expeditions, Inc.*,
  181 Cal. App. 4th 816, 104 Cal. Rptr.3d 844 (2010) ........................................................ 10

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ........................................................................................... 9, 19

*Mercuro v. Superior Ct.*,
  96 Cal. App. 4th 167 (2002) .............................................................................................. 14

*Merkin v. Vonage America Inc.*,
  2014 WL 457942 (C.D.Cal. 2014), *rev'd and remanded on other grounds*, 639 Fed.
  Appx. 481 (9th Cir. 2016) ................................................................................................. 11

*Moua v. Optum Servs., Inc.*,
  320 F. Supp. 3d 1109 (C.D. Cal. 2018) ............................................................................. 18

*Mundi v. Union Sec. Life Ins. Co.*,
  555 F.3d 1042 (9th Cir. 2009) ........................................................................................... 24

*Murray v. United Servs. Auto. Ass'n*,
  2008 WL 4196581 (Cal. Ct. App. Sept. 15, 2008) ............................................................ 18

*Nagrampa v. MailCoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006) ........................................................................................... 14

*Newton v. Am. Debt Servs., Inc.*,
  549 F. App'x 692 (9th Cir. 2013) ....................................................................................... 10

*Newton v. Am. Debt Servs., Inc.*,
  854 F. Supp. 2d 712 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013) .................... 18

*Nyulassy v. Lockheed Martin Corp.*,
  120 Cal. App. 4th 1267 (2004) ............................................................................... 14, 15, 16

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:21-CV-07478-WHA

*O'Hare v. Mun. Res. Consultants*,
  107 Cal. App. 4th 267 (2003) .................................................................. 13, 15

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010) .......................................................... 1, 10, 12, 15

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ....................................................................................... 8, 9

*Sandquist v. Lebo Auto., Inc.*,
  1 Cal. 5th 233 (2016) ...................................................................................... 21

*Selden v. Airbnb, Inc.*,
  2016 WL 6476934 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) .................... 10

*Snarr v. HRB Tax Grp., Inc.*,
  No. 19-CV-03610-SK, 2021 WL 4499415 (N.D. Cal. May 13, 2021) ..................................... 4

*Stanfield v. Tawkify, Inc.*,
  517 F. Supp. 3d 1002 (N.D. Cal. 2021) ................................................... 12, 14

*Stirlen v. Supercuts, Inc.*,
  51 Cal. App. 4th 1519 (1997), *as modified* (Feb. 10, 1997) .................................... 14

*Synopsys, Inc. v. Siemens Industry Software Inc.*,
  2021 WL 1238309 (N.D. Cal. 2021) ................................................................. 23

*Tompkins v. 23andMe, Inc.*,
  840 F.3d 1016 (9th Cir. 2016) ......................................................................... 14

*Van Ness Townhouses v. Mar Indus. Corp.*,
  862 F.2d 754 (9th Cir. 1988) ........................................................................... 23

*Vine v. PLS Fin. Servs, Inc.*,
  807 Fed. Appx. 320 (5th Cir. 2020) .................................................. 19, 20, 21, 22

*Vine v. PLS Fin. Servs., Inc.*,
  331 F.R.D. 325 (E.D. Tex. 2019) ..................................................................... 20

*Volt Info. Sciences, Inc. v. Bd of Trustees of Leland Stanford Junior University*,
  489 U.S. 468 (1989) ........................................................................................ 21

*White v. Mills*,
  2021 WL 6750766 (D.N.J. Dec. 29, 2021) ....................................................... 20

**Statutes**

9 U.S.C § 1, *et seq.* ......................................................................................... 8

**Rules**

Fed. R. Civ. P. 23(d) ........................................................................................ 4

## I.      INTRODUCTION

Pursuant to Coinbase's User Agreement ("UA") and Dispute Resolution Procedure ("DRP") included therein, only the failure to resolve a dispute through Coinbase's "Formal Complaint Process" triggers the obligation to arbitrate disputes, including disputes concerning the enforcement of Coinbase's arbitration provision. But while Coinbase *users* are required to initiate the Formal Complaint Process with respect to *their* disputes, *Coinbase* is under no obligation to initiate the Formal Complaint Process with respect to any disputes *it* might have against a user, nor is there even a mechanism for Coinbase to initiate the Formal Complaint Process against a user. Thus, it is *impossible* for a dispute Coinbase might have against a user to trigger the obligation to arbitrate that dispute, and Coinbase is free to pursue any claims it might have against its users in court while at the same time purporting to bind users to arbitration – a paradigm of unconscionability. *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1001 (9th Cir. 2010) ("Requiring one party to arbitrate its claims but not the other is a paradigmatic form of substantive unconscionability under California law.").[1] Indeed, Judge White found a materially *identical* DRP unenforceable where, similar to here, only claims by the employee could trigger the obligation to arbitrate, and where, like here, the agreement provided for a one-sided prearbitration dispute resolution procedure. *Dunham v. Env't Chemical Corp.*, No. C 06-03389 JSW, 2006 WL 2374703, at *2 (N.D. Cal. Aug. 16, 2006); *see also* § IV(A)(2), *infra*.

Coinbase did not have to draft its arbitration provision in this manner. It could have provided for informal efforts to resolve users' disputes and simply made arbitration a requirement for all disputes arising from or related to the use of Coinbase services regardless of informal dispute resolution procedures – which is exactly what Coinbase did in its most recent UA.[2] Or it could have omitted the informal dispute resolution procedures altogether, as Coinbase

---

[1]      California law governs Coinbase's Motion. UA at ¶ 9.10; *see also* Mot. at p. 7.

[2]      *See* Carlson Decl., **Exhibit A** at ¶ 7.2 and Appx. 5. Coinbase does not contend that Plaintiff is subject to this new UA, or any UA other than the one to which Plaintiff agreed when he signed up for Coinbase. *See* Mot. at n. 1.; *see also* n. 6, *infra*.

did in the Terms of Service for its separate "Coinbase Wallet" service.[3] But having structured an adhesive and comprehensive DRP that applies only to users, Coinbase has imposed a DRP with a central purpose tainted with unconscionability. Under such circumstances, the entire DRP must fall. *See Dunham*, *supra*; *see also Carver v. JFK Memorial Hospital, Inc.*, 2020 WL 6269268, at *11 (Cal.App. 4 Dist., 2020) ("[the dispute resolution process's] prearbitration provisions go to the heart of the arbitration agreement's main purpose of resolving disputes between JFK and its employees. The trial court therefore reasonably declined to sever them.").

***

Mr. Bielski cannot be compelled to arbitrate for a separate reason: the condition precedent to the arbitration of disputes (including disputes regarding enforceability) – the failure of the Formal Complaint Process – did not occur, as Mr. Bielski never submitted a Formal Complaint. While a party to a contract cannot unilaterally prevent a condition precedent from occurring, here Mr. Bielski was under no contractual obligation to submit a Formal Complaint because Coinbase refused to engage in the first step of the DRP – a good faith effort to engage with Mr. Bielski via customer service. *See* UA at ¶ 8.2 (requiring attempt to resolve any dispute "amicably" and providing that escalation to the Formal Complaint Process is required only if "we" cannot resolve the dispute).

Mr. Bielski fulfilled his first step responsibilities by making multiple attempts to engage with Coinbase customer service regarding his dispute, but there was no timely reciprocal effort – an issue that has been documented in national news as a widespread problem.[4] Thus, Mr. Bielski was never contractually required to invoke the Formal Complaint Process, and the non-occurrence of the condition precedent to arbitration was the result of Coinbase's action or lack thereof. *See Darrah v. Friendly Ice Cream Corp.*, 328 F.Supp.2d 319, 322-323 (N.D.N.Y. 2004) (holding that a DRP with substantially similar language required *both* parties to make a "good

---

[3]     *See* Carlson Decl., **Exhibit B**.

[4]     *See* https://www.cnbc.com/2021/08/24/coinbase-slammed-for-terrible-customer-service-after-hackers-drain-user-accounts.html

faith" attempt and use their "informal best efforts" to resolve a dispute before their duties have been fulfilled, and finding that "[b]y refusing to engage in the [informal DRP], defendant clearly failed to comply with a condition precedent to arbitration under the Agreement. Under such circumstances, there was never an agreement by *both* parties to arbitrate the [] claims pending in this forum.") (emphasis in original).

Again, Coinbase did not need to draft its DRP in this manner. But by contractually committing itself to undertaking to "amicably resolve" disputes under the DRP as a condition of arbitration, Coinbase committed itself to attempt, in good faith, to resolve the dispute using its informal best efforts. Having failed to do so, the Court should not rescue Coinbase from the contract it drafted.

***

Agreements to arbitrate – like any other contract – must have "a modicum of bilaterality." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 119 (2000). Coinbase's DRP fails to meet even this low threshold, and for this reason, and those discussed further herein, Coinbase's Motion should be denied and Plaintiff should be permitted to proceed with his putative class action.

## II.   FACTUAL BACKGROUND

### A.   PLAINTIFF'S COINBASE EXPERIENCE

Plaintiff opened his Coinbase account in April 2021, and in so doing agreed to Coinbase's UA. Declaration of Abraham Bielski ("Bielski Decl.") at ¶ 2; *see also* Defs.' RJN, Exh. A.[5] Coinbase's user interface required Mr. Bielski to acknowledge the existence of the UA, but not actually scroll through it, before opening his account. *See* Bielski Decl. at ¶ 3; *see also* McPherson Decl., Exh. 2. Mr. Bielski did not have an opportunity to negotiate the terms of the

---

[5]      While Coinbase does not contend Mr. Bielski is subject to any UA other than the one in effect at the time he opened his account, Coinbase notes that its arbitration provisions did not materially change from when Mr. Bielski signed up for Coinbase through the date Coinbase filed its Motion. *See* Def.'s RJN, Exh. A; *see also* Mot. at n. 3.

1   UA, which were presented on a take it or leave it basis. *See* Bielski Decl. at ¶ 4; *see also*

2   McPherson Decl., Exh. 2.[6]

3          Like other Coinbase users, Mr. Bielski intended to and did use his Coinbase account to

4   _____

5   [6]      Coinbase's most recent UA became effective February 1, 2022 for users who signed up
    for Coinbase on or after January 31, 2022, and effective for users who signed up for Coinbase

6   before January 31, 2022 as of the time they accept the new UA via continued use of Coinbase.
    *See* Carlson Decl., Exh. A at p. 1. Plaintiff has not used Coinbase since the implementation of the

7   new UA and is therefore unquestionably not subject to the new UA. Bielski Decl. at ¶ 5.

8          The UA does not mention this lawsuit and does not give users the opportunity to opt out

9   of the new DRP even though Coinbase has made wholesale changes to it, including, for example:

10   • A mutual obligation to arbitrate claims *not* contingent upon a one-sided Formal
         Complaint process. *See* Carlson Decl., Exh. A at Appx. 5, ¶ 1.1;

11   • A mechanism for users *and* Coinbase to initiate arbitration. *See id.* Appx. 5, ¶ 1.4;

12   • A provision stating that the new arbitration terms apply not only to claims arising
13     on or after February 1, 2022, but also those arising before February 1, 2022 –
       notwithstanding another contractual term that states that the terms of the agreement
14     govern only prospectively. *See id.*, Appx. 5, ¶ 1.1 and p. 1; and

15   • Numerous other new rules concerning, for example, procedure, forum, discovery,
       selection of an arbitrator, authority of the arbitrator, fees and costs, and "batch
16     arbitration." *See id.*, Appx. 5, ¶¶ 1.4-1.8.

17          These terms are notable for at least two reasons. First, they show that Coinbase is able to

18   draft a mutual obligation to arbitrate but declined to do so until recently. Second, the new DRP is

19   deeply concerning to the extent Coinbase may seek to use it to bar putative class members from

20   participating in the class even if the Court decides that Coinbase's one-sided DRP at issue in the
    pending Motion (a materially similar version of which, as Coinbase acknowledges, was in effect

21   throughout the relevant time period until January 31, 2021) is unenforceable. While Plaintiff's

22   counsel has considered multiple ways to raise this issue to the Court (*i.e.*, a motion pursuant to
    Fed. R. Civ. P. 23(d) for a protective order, corrective notice, and/or for a preliminary

23   injunction), at this point counsel believes the best course of action is for the Court to determine

24   whether the new UA is enforceable at class certification, when the rights of putative class
    members who are purportedly subject to the new UA will be squarely before the Court. *See, e.g.*,

25   *Jimenez v. Menzies Aviation Inc.*, No. 15-CV-02392-WHO, 2015 WL 4914727, at *5–6 (N.D.
    Cal. Aug. 17, 2015) ("[c]ourts routinely exercise their discretion to invalidate or refuse to

26   enforce arbitration agreements implemented while a putative class action is pending if the
    agreement might interfere with members' rights."); *Snarr v. HRB Tax Grp., Inc.*, No. 19-CV-

27   03610-SK, 2021 WL 4499415, at *9 (N.D. Cal. May 13, 2021) ("multiple courts have found that
    a party's attempt to introduce new arbitration provisions while a class action is pending is

28   inappropriate where the new arbitration agreement might implicate potential class members'
    rights or where notice of the potential effects of the new arbitration provisions is insufficient.").

trade in cryptocurrency, such as Bitcoin. Bielski Decl. at ¶ 6. Unfortunately, on September 8 and 9, 2021, Mr. Bielski became the target of a scam by an individual who purported to be a representative of PayPal. Bielski Decl. at ¶ 7. Mr. Bielski granted this individual remote access to his computer, which access the perpetrator promptly used to transfer the entirety of Mr. Bielski's funds from his Coinbase account – USD $31,039.06 – to the perpetrator's account. *Id.*

Upon discovering that his account had been compromised, Mr. Bielski initiated a "live chat" with whom he first thought was a live Coinbase customer service representative. Bielski Decl. at ¶ 8. While neither party apparently has a transcript of this interaction, Mr. Bielski recalls that Coinbase's "representative" was in fact a "bot" and provided only template responses and offered no meaningful help whatsoever. *Id.* Mr. Bielski then repeatedly attempted to call Coinbase customer service at the telephone number specified by the UA as the number to call in the event of a compromised account, but was unable to reach anyone. *Id.* Mr. Bielski subsequently wrote two letters to Coinbase at its San Francisco address on September 10 and September 21, 2021, imploring Coinbase to help him. *Id.* [7] Coinbase did not respond to any of Mr. Bielski's repeated inquiries until after he added his name to this case, after which Coinbase sent him multiple, apparently automated, inquiries. *Id.*

**B.   COINBASE'S DISPUTE RESOLUTION PROCEDURE**

   **1.  The Three-Step Dispute Resolution Procedure**

Pursuant to Coinbase's UA, any dispute a user has with Coinbase is subject to Coinbase's three-step DRP. The three-step process is as follows:

Step 1: If a user has a dispute with Coinbase, the user must contact Coinbase through its customer service "support team": "**If *you* have a dispute** with Coinbase (a 'Complaint'), *you* agree** to contact Coinbase through our support team to attempt to resolve any such dispute

---

[7]      The DRP does not mandate any particular method by which a user must attempt to engage with customer support, but does offer the aforementioned telephone number to call specifically if a user's account has been compromised. *See* UA at ¶ 8.1. Additionally, paragraph 8.1 of the DRP requires a user to provide certain information to customer support; Plaintiff's correspondence to Coinbase included all such required information. Bielski Decl. at n. 1.

amicably." UA at ¶¶ 8.1, 8.2 (emphasis added).

Step 2: If the user and Coinbase cannot resolve the user's dispute via Coinbase's customer service, the user must invoke a "Formal Complaint Process": "If we cannot resolve *the dispute* [*i.e.*, the user's dispute] through the Coinbase support team, you and we agree to use the Formal Complaint Process set forth below. **You agree to use this process** before filing any arbitration claim or small claims action. **If *you* do not follow the procedures** set out in this Section before filing an arbitration claim or suit in small claims court, we shall have the right to ask the arbitrator or small claims court to dismiss *your* filing unless and until *you* **complete the following steps**." UA at ¶ 8.2 (emphasis added).

The DRP then describes the Formal Complaint Process itself: "**In the event that *your* dispute with Coinbase is not resolved** through *your* contact with Coinbase Support, *you* **agree to use our Complaint form to describe *your* Complaint**, how you would like us to resolve the Complaint, and **any other information related to *your dispute*** that you believe to be relevant. The Complaint form can be found on the Coinbase support pages, https://support. coinbase.com, or can be requested from Coinbase Customer Support." UA at ¶ 8.2.1 (emphasis added).[8]

Step 3: If the Formal Complaint Process fails to resolve a user's dispute, users and Coinbase agree to arbitration: "***If we cannot resolve the dispute*** [*i.e.*, the user's dispute] **through the Formal Complaint Process,** you and we agree that any dispute arising out of or relating to this Agreement or the Coinbase Services…shall be resolved through binding arbitration, on an individual basis (the 'Arbitration Agreement')." UA at ¶ 8.3 (entire text bold in original, italics added).

Conversely, the DRP is silent as to how any dispute Coinbase might have with a user is to be resolved, and any dispute Coinbase might have with a user cannot trigger the agreement to arbitrate. *See* UA at ¶¶ 8.1-8.3. Indeed, Coinbase has notified users that *they* owe *Coinbase*

---

[8]     This link does not lead users to the Formal Complaint form, but rather a landing page for various informational topics, none of which are how to submit a Formal Complaint. Even typing "Formal Complaint" into the search bar at the top of the landing page fails to yield a link to form.

money arising from funds stolen from their Coinbase accounts. *See*, *e.g.*, Declaration of Hung

Phan at ¶¶ 2-3 and Exh. A. Coinbase, however, has not attempted to invoke the DRP with respect

to such disputes, nor could it under the terms of the DRP. *Id.* at ¶ 3.

### 2.  The Delegation Provision

Coinbase's "Arbitration Agreement" is expressly defined to "include[], without

limitation, disputes arising out of or related to the interpretation or application of the Arbitration

Agreement, including the enforceability, revocability, scope, or validity of the Arbitration

Agreement or any portion of the Arbitration Agreement. All such matters shall be decided by an

arbitrator and not by a court or judge." UA at ¶ 8.3. Thus, <u>as with the larger agreement to</u>

<u>arbitrate disputes, Coinbase is not obligated to arbitrate any dispute it might have with a user</u>

<u>regarding the enforceability, revocability, scope, or validity of the Arbitration Agreement (*i.e.*,</u>

<u>"gateway issues"), nor can any such dispute Coinbase might have against a user trigger the</u>

<u>delegation provision</u>. *Id.*

### 3.  The Class Waiver

The DRP also includes a class action waiver nested within the larger Arbitration

Agreement, between the agreement to arbitrate and arbitration-related procedures:

> CLASS ACTION WAIVER: TO THE EXTENT PERMISSIBLE BY LAW, ALL
> CLAIMS MUST BE BROUGHT IN A PARTY'S INDIVIDUAL CAPACITY,
> AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED
> CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE PROCEEDING
> (COLLECTIVELY "CLASS ACTION WAIVER"). THE ARBITRATOR MAY
> NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS OR ENGAGE
> IN ANY CLASS ARBITRATION. YOU ACKNOWLEDGE THAT, BY
> AGREEING TO THESE TERMS, YOU AND COINBASE ARE EACH
> WAIVING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO
> PARTICIPATE IN A CLASS ACTION.

UA at ¶ 8.3 (bold typeface removed).

### 4.    Other Relevant Terms of the User Agreement

The UA includes a unilateral prospective modification provision which states:

We may amend or modify this Agreement at any time by posting the revised

---

7

agreement on the Coinbase Site and/or providing a copy to you (a "Revised Agreement"). The Revised Agreement shall be effective as of the time it is posted but will not apply retroactively. Your continued use of the Services after the posting of a Revised Agreement constitutes your acceptance of such Revised Agreement. If you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your account.

UA at ¶ 1.2.

Coinbase has exercised this or similar unilateral modification provisions on at least thirty-seven occasions. *See* Declaration of Matthew D. Carlson. at ¶ 2.

The UA does not include any provision that allows users to opt out of arbitration or any other term of the UA. *See*, *generally*, UA and Appendices thereto.

## III.   LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), 9 U.S.C § 1, *et seq.*, agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, an arbitration agreement may be found unenforceable pursuant to "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010).

## IV.   ARGUMENT

On a motion to compel arbitration, a court's role under the FAA is typically "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 827 (9th Cir. 2021). However, these "gateway" issues "can be expressly delegated to the arbitrator where the parties clearly and unmistakably provide otherwise" pursuant to an enforceable "delegation provision." *Id.* (*citing Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015)).

Where, like here, such "a delegation provision exists, courts first must focus on the enforceability of that specific provision, not the enforceability of the arbitration agreement as a whole." *Brice*, 13 F.4th at 827 (*citing Rent-A-Center*, 561 U.S. at 71; *Brennan*, 796 F.3d at 1132). A delegation provision "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this

additional arbitration agreement just as it does on any other." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021). Thus, a delegation provision is subject to the same "generally applicable contract defenses" as the larger arbitration provision, such as unconscionability. *Id.* If the court determines that the delegation provision is unconscionable, and declines to sever it from the arbitration provision, it may properly conclude that the larger arbitration provision is unenforceable for the same reasons. *Lim*, 8 F. 4th at 1005-1006. Accordingly, Mr. Bielski first addresses Coinbase's delegation provision before turning his attention to the arbitration provision as a whole.

A.     **THE DELEGATION PROVISION IS UNENFORCEABLE BECAUSE IT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE**

Whether an agreement is unconscionable is a question of law. *In re Juul Labs, Inc., Antitrust Litigation*, 2021 WL 3675208, at *11 (N.D. Cal., Aug. 19, 2021). Under California law, the unconscionability doctrine encompasses an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id*. Unconscionability has both "procedural" and "substantive" elements. *Id.* "Both the procedural and substantive elements must be met before a provision will be deemed unconscionable, but both need not be present to the same degree. Rather, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (internal quotations omitted).

1.     **The Delegation Provision is a Procedurally Unconscionable Contract of Adhesion**

Procedural unconscionability exists where an agreement involves oppression, consisting of a lack of negotiation and meaningful choice, or surprise, such as where the term at issue is hidden within a wordy document. *Id.* (*citing Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 821, 104 Cal. Rptr.3d 844 (2010)). "California law treats contracts of adhesion, or

at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (*superseded by statute on other grounds*).

Not surprisingly, courts have routinely found that non-negotiable, take it or leave it contracts like Coinbase's are procedurally unconscionable; indeed, it is so much of an obvious conclusion that courts refer to such agreements as "online adhesion contracts." *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at \*4 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 346–47 (2011) (noting "the times in which consumer contracts were anything other than adhesive are long past.").[9] In fact, the Ninth Circuit has found such adhesion contracts to be per se "oppressive (and therefore procedurally unconscionable)," *Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692, 694 (9th Cir. 2013), and has repeatedly stated that "a contract is procedurally unconscionable under California law if it is 'a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" *Pokorny*, 601 F.3d at 996 (*citing Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)).

Numerous other courts applying California law have likewise concluded that online adhesion contracts are procedurally unconscionable to varying degrees. For example, the district court in *Merkin v. Vonage America Inc.*, 2014 WL 457942 (C.D.Cal. 2014), *rev'd and remanded on other grounds*, 639 Fed. Appx. 481 (9th Cir. 2016) found that an online contract that the consumer was "given no opportunity to negotiate" was a contract of adhesion and therefore "per se oppressive" and thus procedurally unconscionable under *Newton*. *Id.* at \*6-7. The district court further found that the defendant's prospective unilateral modification provision – which it had exercised thirty-six times over a ten-year period – along with the inherent

---

[9]     Coinbase's UA does not include an opt-out provision. *Compare Arellano v. T-Mobile USA, Inc.*, No. C 10-05663 WHA, 2011 WL 1362165, at \*4 (N.D. Cal. Apr. 11, 2011) (commenting that a "meaningful opportunity to opt out" of arbitration can preclude a finding of procedural unconscionability and noting that such a "meaningful opportunity opt out" may exist where a customer could have opted out and maintained the same service, benefits, and price).

adhesive nature of the contract resulted in a "high degree of oppression." *Id.* at *8.[10]

Here, Coinbase's standardized delegation provision has been presented to users, including Mr. Bielski, on a take it or leave it basis, with no opportunity to opt out, and subject to a unilateral modification provision that has been exercised thirty-seven times over a ten-year period. Thus, like the agreement in *Merkin*, Coinbase's delegation provision is per se oppressive and procedurally unconscionable to a "high degree."

### 2.    The Delegation Provision is Substantively Unconscionable

#### i.    *The Delegation Provision is Substantively Unconscionable Because It Can Only Be Triggered by a User's Dispute*

California law requires arbitration agreements to have a "modicum of bilaterality," *Armendariz*, 24 Cal. 4th at 114. "In assessing substantive unconscionability, the paramount consideration is mutuality." *Abramson v. Juniper Networks, Inc.*, 115 Cal.App.4th 638, 664 (2004). Thus, "[w]hen only the weaker party's claims are subject to arbitration, and there is no reasonable justification for that lack of symmetry, the agreement lacks the requisite degree of mutuality." *Id.* at 657.

Courts have found substantive unconscionability based on a lack of mutuality in numerous scenarios, and Judge White's decision in *Dunham*, *supra*, is particularly instructive. There, the DRP stated, in relevant part: "Should EMPLOYEE exhaust the remedies provided by the grievance procedures of ECC International, EMPLOYEE and ECC International agree and understand that any controversy or claim arising out of or relating to EMPLOYEE's employment shall be settled by arbitration." *Dunham*, 2006 WL 2374703, at *7. Judge White found that "[this] phrase implies that the parties agree that Dunham's claims, once administratively exhausted, will be submitted to arbitration. Nothing in the Arbitration Agreement suggests that ECC's claims, whether administratively exhausted or not, will be similarly submitted to

---

[10]    The Ninth Circuit agreed with the district court's finding regarding procedural unconscionability but reversed on grounds that the single substantively unconscionable term at issue should have been severed from the agreement. *Merkin*, 639 F. App'x at 482.

arbitration." *Id.* This language is materially *identical* to the language in Coinbase's DRP.

In *Pokorny*, *supra*, plaintiffs (referred to as Independent Business Owners, or "IBOs") were required to submit any disputes they might have against Quixtar to a non-binding conciliation process then, if the IBO wished to pursue a dispute further, submit the dispute to arbitration. *Pokorny*, 601 F.3d at 1000–01. The court noted that although Quixtar could be forced into arbitration if an IBO initiated a dispute, because the contract "contain[ed] no provision requiring Quixtar to initiate any claim it has against an IBO using the Quixtar ADR process," Quixtar was "free to initiate and litigate any claim it ha[d] against an IBO without ever submitting the claim to binding arbitration." The court found that this framework was "paradigmatic form of substantive unconscionability under California law." *Id.* at 1001.

In *Stanfield v. Tawkify, Inc.*, 517 F. Supp. 3d 1002 (N.D. Cal. 2021), this Court found an agreement to arbitrate substantively unconscionable because it was a "one-way street." *Id.* at 1006. Specifically, while the defendant argued that the agreement should be interpreted to require it to arbitrate its disputes, this Court rejected that argument, finding that the express terms of the agreement required only the user to arbitrate claims. *Id.* at 1007. The Court further noted that "[i]t would have been easy to use" language mutually obligating the parties to arbitrate,[11] and also commented that Tawkify's Privacy Policy, which stated that "we will not disclose your photos or identifying information without your permission to prospective matches, nor theirs to you," as well as Tawkify's unilateral modification provision, "show[ed] that Tawkify knew how to make a promise." *Id.*[12]

Similarly, in *O'Hare v. Mun. Res. Consultants*, 107 Cal. App. 4th 267 (2003), a Court of Appeal found an arbitration provision substantively unconscionable because it "lack[ed] the required 'modicum of mutuality' because it required plaintiff to arbitrate all of his claims," but

---

[11]     *Compare* Carlson Decl., Exh. A at Appx. 5; Carlson Decl., Exh. B.

[12]     *Compare* https://www.coinbase.com/legal/privacy ("We will not use your personal information for purposes other than those purposes we have disclosed to you, without your permission."); *also compare* UA at ¶ 1.2 (unilateral modification provision).

was "silent" about requiring the defendant to arbitrate any "claim it may have against [the plaintiff]." *Id.* at 274; *see also id. at* 279 (finding that the defendant "drafted a completely one-sided agreement compelling [plaintiff] to arbitrate all of its claims while allowing [defendant] to file a lawsuit on any claim it had against him.").

In *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322 (1999), the court determined that an arbitration provision was substantively unconscionable where the provision required the defendant to submit to arbitration when an employee had initiated arbitration proceedings, but otherwise created no obligation for the defendant to pursue any claim it might have in arbitration. *Id.* at 1332. The court concluded, simply, that "[f]aced with the issue of whether a unilateral obligation to arbitrate is unconscionable, we conclude that it is."

And in *Bakersfield Coll. v. California Cmty. Coll. Athletic Assn.*, 41 Cal. App. 5th 753 (2019) the court found substantively unconscionable a multi-step, unilateral dispute resolution procedure applicable only to disputes brought by a member college, culminating in a purportedly bilateral requirement to arbitrate disputes. *Id.* at 765-66. In reaching its conclusion, the court noted that while the final step of the process – the agreement to arbitrate – was phrased in bilateral terms, the language of preceding provisions established that the process – and resulting requirement to arbitrate – applied only to colleges. *Id.* at 766–767.[13]

Here, the delegation provision (as well as the larger agreement to arbitrate, as discussed below) does not contain even a modicum of bilaterality, and is not just "unfairly one-sided" – it is *completely* one-sided. Like the circumstances in the above-cited cases, any disputes Coinbase might have with users – including disputes pertaining to the delegation provision – simply do not trigger the obligation to arbitrate. And like the circumstances in the above-cited cases, while the

---

[13]    *See also Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1282 (2004) (arbitration provision substantively unconscionable where it "contain[ed] only a unilateral agreement to arbitrate; any claims that defendant may have that arise out of plaintiff's employment are not subject to the arbitration clause."); *Gonzalez v. Preferred Freezer Servs., LBF, LLC*, 2012 WL 2602653, at *3 (C.D. Cal. July 5, 2012) (finding dispute resolution policy that required only employees to submit to binding arbitration substantively unconscionable).

language of the agreement to arbitrate disputes is couched in bilateral terms, such language is meaningless because it does not obligate Coinbase to arbitrate its disputes against users. Phrased differently, if Coinbase were to read its own UA to determine how it could proceed with a dispute against Mr. Bielski (including a dispute subject to the delegation provision), it would find itself completely without guidance and thus free to pursue an action in court.[14]  Moreover, just like the defendant in *Tawkify*, Coinbase has demonstrated in other contexts that it knows how to draft a mutual agreement to arbitrate disputes and has demonstrated that it knows how to bind itself to an obligation. But it chose a different path with respect to this arbitration provision (and with the delegation provision included therein), and in so doing has refused its users even a crumb of bilaterality. *Tawkify*, 517 F. Supp. 3d at 1007 (stating "the TOS refused users even a crumb of bilaterality because users had to subject their claims to arbitration, while Tawkify could go to court.").[15]

### ii. *The Delegation Provision is Substantively Unconscionable Because the Prearbitration Process Offers Coinbase a Unilateral "Free Peek" at Users' Claims*

As detailed above, a significant portion of Coinbase's DRP is composed of numerous

---

[14]    Courts have found that agreements to arbitrate may properly "carve out" from arbitration certain types of claims, such as intellectual property claims, that may be justified by a "legitimate commercial need." *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1031 (9th Cir. 2016); *but see Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1286–87 (9th Cir. 2006); *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1540-41 (1997), *as modified* (Feb. 10, 1997); *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 854 (2001); *Mercuro v. Superior Ct.*, 96 Cal. App. 4th 167, 176 (2002). But Coinbase clearly goes further, permitting itself a judicial forum for *any* claim, not just certain types of claims that could conceivably be justified by a purported "commercial need." *See Tawkify*, 517 F. Supp. 3d at 1008 ("Tawkify placed no reasonable parameters on its exemption from a mutual obligation to arbitrate, while in *23andMe* the arbitration agreement limited the scope of the exemption to only intellectual property disputes. For all other disputes, 23andMe's arbitration agreement established a mutual obligation between 23andMe and its customers, as explained by Judge Koh's analysis of the agreement.").

[15]    To the extent Coinbase may argue that California Civil Code section 1655 permits the Court to imply a bilateral agreement to arbitrate, it would be mistaken. *See O'Hare*, 107 Cal. App. 4th at 276–77 (section 1655 not applicable because the agreement manifested an intent to bind only the plaintiff to arbitration).

1
2
3
prearbitration terms that apply only to users. As discussed by federal and state courts applying California law, these numerous one-sided provisions add a significant degree of substantive unconscionability to an already one-sided agreement.

4
5
6
7
For example, in *Dunham*, *supra*, Judge White found that a "one-sided duty to exhaust pre-arbitration remedies" "adds to the contract's substantive unconscionability by permitting ECC to preview Dunham's claims against her employer." *Dunham*, 2006 WL 2374703, at *8 (*citing Nyulassy*, 120 Cal. App. 4th at 1282-1283).

8
9
10
11
12
13
14
15
16
17
18
19
Similarly, in *Pokorny*, 601 F.3d at 987, the Ninth Circuit found that the prearbitration procedures in Quixtar's ADR agreement were substantively unconscionable in significant part because the procedures "require[d] an IBO to submit any claim it has against Quixtar to Informal and Formal Conciliation, [but] they impose[d] no similar obligation on Quixtar when it has a claim against one of its IBOs." *Id.* at 998. While Quixtar argued that language in the agreement indicated that both parties would "try to resolve the dispute as provided for under the[] [prearbitration process]," a "fair reading" of the agreements did not support Quixtar's position because the agreements did not "creat[e] [] any duties or responsibilities for Quixtar." *Id.* at 998-999. This scenario resulted in a potential "free peak" at an IBO's claims and amounted to "little more than an exploratory evidentiary hearing for Quixtar," particularly because it controlled both the process and retained the ultimate authority over the result of the dispute. *Id*. at 999.[16]

20
21
22
23
24
25
26
27
28
[16]     *See also Nyulassy*, 120 Cal.App.4th at 1282-1283 (finding substantively unconscionable an agreement requiring only employees to submit to employer-controlled dispute resolution mechanism because it lacked mutuality and permitted defendant a "free peek' at [the] plaintiff's case, thereby obtaining an advantage if and when [the] plaintiff were to later demand arbitration"); *Carver*, 2020 WL 6269268, at *6 (finding substantively unconscionable a unilateral four-step prearbitration provision that required only employees to engage in an employer-controlled process that would give the employer a "free peek" at claims, and rejecting argument that the provision were mutual in light of the "unambiguous language" of the agreement); *Carlson*, 239 Cal.App.4th at 635 (finding substantively unconscionable provision that required only employees to submit alternative dispute resolution before demanding arbitration.); *Carmona v. Lincoln Millenium Car Wash, Inc*., 226 Cal.App.4th 74, 89 (2014) (finding substantively unconscionable term that subjected employees to mandatory prearbitration disclosures while "[t]he employer ha[d] no corresponding obligation under the agreement to discuss its disputes with employees before taking action in court or through arbitration.").

Here, Coinbase's DRP similarly requires only users to submit any disputes it might have against Coinbase – including disputes under the delegation provision – to Coinbase for Coinbase's internal review. Users are required to submit any information and documentation they might have to support their complaint, thus providing Coinbase with a "free peek" at potential legal theories, including theories pertaining to the delegation provision. There is no independent review of a user's dispute in the prearbitration procedure; Coinbase retains the absolute right to accept or reject a claim. Coinbase, on the other hand, is under no such obligation to engage in this procedure. Because all disputes – including disputes contemplated by the delegation provision – are subject to Coinbase's unilateral prearbitration procedures, these procedures contribute to the substantive unconscionability of the delegation provision specifically, as well as the broader agreement to arbitrate substantive disputes.

> ### 3. The Delegation Provision Cannot be Saved by Modifying the Language of the Provision or by Severing Unconscionable Terms

While courts have the discretion to sever unconscionable terms from an agreement to arbitrate, severance is only appropriate where "'the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction.'" *Klink v. ABC Phones Of North Carolina, Inc.*, No. 20-CV-06276-EMC, 2021 WL 3709167, at *12 (N.D. Cal. Aug. 20, 2021) (*citing Armendariz*, 24 Cal. 4th at 124). "The dispositive question, therefore, is whether 'the central purpose of the contract is [so] tainted with illegality' that there is no lawful object of the contract to enforce." *Klink*, 2021 WL 3709167, at *12 (*citing Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974, 996, *as modified* (Mar. 12, 2008).

For example, in *Dunham*, *supra*, Judge White determined that the combination of a one-sided obligation to arbitrate claims and a one-sided prearbitration dispute resolution process rendered the entire arbitration provision unenforceable. *Dunham*, 2006 WL 2374703, at *12-13. Specifically, the court found that "[t]he one-sided duty to arbitrate, in conjunction with

Dunham's duty to exhaust company grievance procedures, indicates that the agreement is 'tainted with illegality,' and that the illegality is not merely collateral to the agreement." *Id.* at *13 (*citing Armendariz*, 24 Cal.4th at 124). Thus, the court refused to sever the offending provisions and found the entire arbitration agreement unenforceable. *Id.*[17]

Here, the arbitration agreement's lengthy one-sided prearbitration procedure, culminating in an agreement to arbitrate disputes – including disputes identified in the delegation provision – can be triggered only by a user's dispute, and therefore likewise strikes at the heart of the contract: the method of resolving disputes and the agreement to arbitrate. *See Carver*, 2020 WL 6269268, at *9 (the "prearbitration terms [] contained in numerous paragraphs"…"go to the heart of the arbitration agreement's main purpose of resolving disputes between [the defendant] and its employees" and, therefore "[t]he trial court [] reasonably declined to sever them.").[18] These two components of the DRP create a "high level of substantive unconscionability" in the delegation provision – and the overall arbitration provision, as discussed below – and preclude severance.[19]

---

[17] The arbitration provision in *Dunham* also included a cost-sharing provision that the court found "may" be unconscionable, but this term did not factor into the court's decision to strike the full arbitration agreement. *Id.* at *9.

[18] The DRP here is more one-sided than in *Carver* because in *Carver*, while the prearbitration terms were one-sided, the obligation to arbitrate was apparently bilateral.

[19] While it may be grammatically possible for the Court to strike the language that renders the delegation provision (and the entire agreement to arbitrate) unilateral, and while it may be grammatically possible to strike the numerous one-sided prearbitration provisions, courts are unwilling to do so where, like here, the agreement to arbitrate itself is unconscionable because it is non-mutual. *See Dunham*, *supra*; *compare Lang v. Skytap, Inc.*, 347 F. Supp. 3d 420, 433 (N.D. Cal. 2018) ("the arbitration agreement is mutually binding on both parties, making severance an option to cure the substantive unconscionability."); *compare also Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 728-729 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013) (severance is permissible when "the illegal provision can be extirpated from the contract by means of severance or restriction" *and* "the illegality is collateral to the main purpose of the contract.") (citing *Armendariz*, 24 Cal. 4th at 124).

Relatedly, some courts have been willing to sever certain terms – such as carve outs for intellectual property claims, forum selection, fee and cost shifting, and confidentiality provisions, and so forth – to save an arbitration provision. The premise of these courts' decisions are, generally, that such terms are "merely collateral" to the agreement to arbitrate. *See* (*cont'd*)

---

1  *See Dunham*, 2006 WL 2374703 at \*10; *Moua v. Optum Servs., Inc.*, 320 F. Supp. 3d 1109,

2  1114–15 (C.D. Cal. 2018) (term that "create[d] an imbalance of mutuality" that "render[ed] the

3  agreement's entire purpose – to impose arbitration – an illusory promise" could not be

4  severed).[20]

5  **B.   THE LARGER AGREEMENT TO ARBITRATE IS UNENFORCEABLE FOR
      ESSENTIALLY THE SAME REASONS THAT THE DELEGATION PROVISION
6      IS UNENFORCEABLE**

7         For essentially the same reasons that the delegation provision is procedurally and

8  substantively unconscionable and cannot be saved by severing the unlawful terms, the larger

9  arbitration provision must fail as well. Just as the agreement to delegate gateway issues to the

10  arbitrator is a take it or leave it online contract of adhesion, with no opportunity to opt out, so too

11  is the larger arbitration provision. And just as the delegation provision can be triggered only by a

12  user's claim, the larger agreement to arbitrate substantive issues can be triggered only by a user's

13  claim and is therefore simply another one-sided agreement to arbitrate that is, again, a "paradigm

14  of unconscionability." Likewise, the one-sided prearbitration procedures apply to substantive

15  disputes under the larger agreement to arbitrate and therefore contribute to the substantive

16  unconscionability of the larger agreement.

17         Because these provisions are just as fundamental to the larger arbitration agreement as

18  they are to the delegation provision, the entire arbitration agreement is unenforceable. *See Lim*, 8

19

20
   *Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1008 (N.D. Cal. 2015), *aff'd*, 699 F. App'x 620
21  (9th Cir. 2017) ("California law allows the court to sever any unconscionable provisions *so long
   as they are merely collateral to the main purpose of the arbitration agreement.*") (internal
22  quotations omitted; emphasis added). Here, however, one-sided aspects of the arbitration
   provision are the agreement to arbitrate itself and the lockstep procedures leading up to it.
23
24  [20]    The agreement to arbitrate in Coinbase's UA could indeed be characterized as "illusory"
   because while the agreement purports to bind both Coinbase and its users, Coinbase is in fact
25  free to pursue any of its claims in litigation. *See Harris v. Tap Worldwide, LLC*, 248 Cal. App.
   4th 373, 385 (2016) ("A contract is unenforceable as illusory when one of the parties has the
26  unfettered or arbitrary right to modify or terminate the agreement *or* assumes no obligations
   thereunder.") (emphasis added); *see also Murray v. United Servs. Auto. Ass'n*, 2008 WL
27  4196581, at \*13 (Cal. Ct. App. Sept. 15, 2008) ("A contract is illusory and there is no valid
   contract when one of the parties assumes no obligation.").
28

F.4th at 1006 ("Because the district court correctly held that the delegation clause was unenforceable as procedurally and substantively unconscionable, the district court properly proceeded to determine the gateway issue of arbitrability. In doing so, the district court correctly concluded that the same bases for concluding that the delegation clause was procedurally and substantively unconscionable…also rendered the arbitration provision unconscionable. And for the same reasons it did not err by declining to sever the unconscionable terms with respect to the delegation clause, the district court did not err by not severing those same terms and declining to enforce the arbitration provision.").

## C.   THE CLASS WAIVER CANNOT SURVIVE INDEPENDENT OF THE ARBITRATION PROVISION

To the extent Coinbase may argue that the class waiver included in the DRP should survive the failure of the arbitration provision, it would be incorrect, as case law makes clear that Class Waiver must fall with the arbitration agreement of which it is part and parcel.

In *Vine v. PLS Financial Services, Inc.*, 807 Fed. Appx. 320 (5th Cir. 2020), the Fifth Circuit Court of Appeals was called upon to determine whether a class waiver could be enforced in court after it had been determined that the defendant waived its right to arbitration. *Id.* at 326-329. The court determined that "the most plausible way to interpret a class action waiver in the middle of an arbitration provision is as part of the explanation of the rules, rights, and procedures that apply if a dispute is arbitrated—not as an independently effective waiver of the right to pursue a class action outside the arbitration context." (Internal quotations omitted.) The court also determined that the language of the arbitration provision indicated that the class waiver was contingent upon the agreement to arbitrate, *id.* at 328, and noted that the defendant's intent to limit the class waiver to the context of arbitration could be inferred by other contract terms indicating that it knew how to differentiate between judicial and arbitral proceedings, but chose not to clarify in what forum (or multiple fora) the class waiver would apply. *Id.* at 328-329 (citing *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) ("It is well-

established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used.")); *see also Vine v. PLS Fin. Servs., Inc.*, 331 F.R.D. 325, 331 (E.D. Tex. 2019).

Similarly, in *In re Rivers*, 2010 WL 5375950 (Bankr. S.D. Miss. Dec. 22, 2010), a district court determined that a class action waiver located between the agreement to arbitrate and the procedures applicable to arbitration should be construed as applying only to proceedings in arbitration. *Id.* at *2-3. The court reasoned that "the location of the Purported Class Action Waiver in the Arbitration Provision and its failure to address whether it applies to litigation as well as arbitration" required the court to construe the agreement against the defendant and, in light of this, and looking "to the Arbitration Provision as a whole," it was "clear that the parties that the parties only intended the class action waiver to apply to arbitration." *Id.* In addition to the placement of the waiver and the defendant's failure to specify the forum (or multiple fora) in which it was applicable, the court also noted that because the arbitration provision purported to "dispose[] of any right [plaintiff] had to litigate claims "arising from or related to [the Contract]," it would "not [be] reasonable to read the Purported Class Action Waiver as applicable to litigation." *Id. See also White v. Mills*, 2021 WL 6750766, at *4 (D.N.J. Dec. 29, 2021) ("Defendant's position that the Waiver is a standalone provision untethered to the Arbitration Agreement is unsupported by the structure of the Terms and Conditions. Further, even if the language of the Waiver was ambiguous, where there is ambiguity, the words are construed against the drafter.") (internal quotations removed).[21]

Here, Coinbase's Class Waiver is sandwiched between Coinbase's recitation of the

---

[21] One case has attempted to distinguish *Vine*. In *Figueredo-Chavez V. RCI Hospitality Holdings, Inc.*, 2021 WL 5763577 (S.D. Fla. Dec. 3, 2021), the court apparently understood *Vine* to hold that class action waivers outside the context of arbitration are per se unenforceable, which the *Figueredo-Chavez* court found to run afoul of *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018). *Id.* at *5-6. But *Vine*'s holding was not so broad: it was based simply on the interpretation of the arbitration agreement in that case and the class waiver included therein. *Vine*, 807 F. App'x at 328. Like in *Vine,* the most reasonable interpretation of Coinbase's DRP is that the class waiver was intended to apply only in arbitral proceedings.

agreement to arbitrate and the rules and procedures applicable to an arbitration proceeding. UA at ¶ 8.3. The Class Waiver makes no reference to proceedings in court, and in fact states that "the *arbitrator* may not consolidate more than one person's claims or engage in any class arbitration." (Italics added, all capitals in original.) The Waiver also states that "By agreeing to these terms, you and Coinbase are each waiving the right to a trial by jury and the right to participate in a class action." (Emphasis added.)[22] Further, nowhere in the entire DRP does Coinbase contemplate the possibility of proceedings in court – *except* in a provision that states "you may elect to pursue your claim in your local small claims court rather than through arbitration so long as your matter remains in small claims court and proceeds only on an individual (non-class and non-representative) basis." UA at ¶ 8.3. This provision in particular shows that (1) the terms of the arbitration provision were intended to apply only in arbitration, except as otherwise provided; and (2) Coinbase knew exactly how to specify when certain provisions would apply in court and when certain provisions would apply in arbitration.

As discussed in *Vine* and *Rivers*, and particularly with any ambiguities construed against Coinbase, the Waiver is most plausibly understood as providing that users gave up their right to participate in a class action by virtue of agreeing to arbitration.[23] Having had that agreement to arbitrate nullified, users are "free to select another form of dispute resolution, including a class action." *Vine*, 807 Fed. Appx. at 328-329.

*//*

---

[22]     Whether "these terms" refers to the arbitration provision or the complete terms of the UA is possibly ambiguous, and, if so, must be narrowly construed against Coinbase. *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016) ("Where the drafter of a form contract has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract principles require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation."). Plaintiff notes that any ambiguity regarding the continued viability of the class waiver in court has nothing to do with the scope of the agreement to arbitrate – which is not at issue here – any ambiguities about which would be resolved in favor of arbitration. *See, e.g.*, *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989).

[23]     Relatedly, the "strong public policy in favor of arbitration" does not apply in this context, when the question is whether a case proceeding *in court* is subject to a class waiver.

**D.     ALTERNATIVELY, COINBASE'S MOTION SHOULD BE DENIED BECAUSE COINBASE DID NOT ATTEMPT TO RESOLVE PLAINTIFF'S DISPUTE IN GOOD FAITH AS REQUIRED BY THE DRP**

If the Court determines that Coinbase's DRP is enforceable as a general matter, the DRP nonetheless should not be enforced in this case because the condition precedent to arbitrating disputes (including disputes encompassed by the delegation provision, such as disputes regarding enforceability) – failure of the Formal Complaint Process – never occurred, because Mr. Bielski never submitted a Formal Complaint. Bielski Decl. at ¶ 9.

To be sure, parties to a contract cannot avoid contractual conditions by preventing the conditions from occurring. However, as discussed in *Darrah v. Friendly Ice Cream Corp.*, 328 F.Supp.2d 319 (N.D.N.Y. 2004), the crux of the matter is whether Coinbase's actions or inactions ultimately resulted in the non-occurrence of the condition precedent to arbitration. Still more precisely, the issue is whether both parties fulfilled their duties to attempt to "resolve the dispute through the Coinbase support team." If Coinbase failed to do so, Mr. Bielski was under no contractual obligation to proceed to the second step of the DRP and is therefore not required to arbitrate either gateway issues or his substantive dispute.

Informal dispute resolution procedures such as this one require *both* parties to make a "good faith" attempt and use their "informal best efforts" to resolve a dispute before their duties have been fulfilled under a DRP – a "two-way street [that] must [] be engaged in, by both sides…" *Darrah*, 328 F.Supp.2d at 322. This requirement is consistent with the implied duty of good faith and fair dealing present in every contract. *See Foley v. Interactive Data Corp.*, 765 P.2d 373, 389–90 (Cal. 1988) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.…the courts employ the good faith doctrine to effectuate the intentions of parties, or to protect their reasonable expectations.") (internal quotations and citations omitted). Indeed, the Coinbase DRP makes this good faith, best efforts requirement express, as it refers to "we" – *i.e.*, both parties – attempting to resolve disputes via customer service "amicably." As highlighted in *Darrah*, a party does *not* fulfill its obligations

1    under an informal dispute resolution procedure by simply ignoring a dispute, like Coinbase did

2    with Mr. Bielski's inquiry. More is required – specifically "good faith" and "informal best

3    efforts." *Id.* at 322.

4         Mr. Bielski did everything he reasonably could to communicate with Coinbase customer

5    service regarding his account breach and was met with nothing but unanswered phone calls,

6    template emails, and robots. At no point was he ever even given the opportunity to discuss his

7    issue in any sort of substance with a live human being until after he joined this litigation. Mr.

8    Bielski did what he was supposed to do under the first step of the DRP. Coinbase did not. For

9    that reason, Mr. Bielski was under no obligation to proceed further under the DRP, and the

10    failure of the condition precedent to arbitration was a result of Coinbase's conduct alone.

11         Once again, Coinbase did not need to expressly condition arbitration of disputes

12    (including disputes subject to the delegation provision) on informal but meaningful attempts at

13    dispute resolution. But having done so, Coinbase should not be permitted to force Mr. Bielski to

14    attempt to engage in the DRP, only to make compliance impossible. Under such circumstances,

15    the parties simply did not agree to arbitrate substantive disputes, nor did they agree to arbitrate

16    matters encompassed by the delegation provision. *Darrah*, 328 F.Supp.2d at 323 ("By refusing

17    to engage in the [informal DRP], defendant clearly failed to comply with a condition precedent

18    to arbitration under the Agreement. Under such circumstances, there was never an agreement

19    by *both* parties to arbitrate the [] claims pending in this forum.") (emphasis in original);[24] *see*

20

21   

---

[24]      While courts have commented generally that "procedural issues" such as failures of
22    conditions precedent are typically for an arbitrator to decide, this is only true "once it is
determined that the parties are obligated to submit the subject matter of a dispute to arbitration,"
23    in which case "procedural questions which grow out of the dispute and bear on its final
disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543,
24    557–58 (1964). Here, however, the failure of the condition precedent bears on the fundamental
issue of whether the parties agreed to arbitrate this dispute at all. *See Darrah*, *supra*; *see also*
25    *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1988)) ("The threshold
issue in deciding a motion to compel arbitration is 'whether the parties agreed to arbitrate.'").
26    Moreover, there is no procedural "issue" to be decided by anyone because there is no dispute that
the condition precedent to arbitration have not been met. *See Synopsys, Inc. v. Siemens Industry*
27    *Software Inc.*, 2021 WL 1238309, at *4–5 (N.D. Cal. 2021).

28

---

*also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) ("[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"…"[t]he public policy favoring arbitration does not apply to disputes the parties have not agreed to arbitrate.") (internal citations and quotations omitted). Coinbase's Motion can therefore be denied on this alternative basis.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Coinbase's Motion.

Dated: February 10, 2022              LAW OFFICE OF MATTHEW D. CARLSON


By: */s/ Matthew D. Carlson*
     Matthew D. Carlson
     Attorney for Plaintiff