Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
Wesley M. Griffith (State Bar No. 286390)
*wgriffith@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

Hassan A. Zavareei (State Bar No. 181547)
*hzavareei@tzlegal.com*
Spencer S. Hughes (appearance *pro hac vice*)
*shughes@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900

Matthew D. Carlson (State Bar No. 273242)
*mdcarlson@mdcarlsonlaw.com*
**LAW OFFICE OF MATTHEW D. CARLSON**
3959 North Buffalo Road, Suite 29
Orchard Park, New York 14127
Telephone: (716) 242-1234

*Counsel for Plaintiffs Abraham Bielski, Dzhura Binyaminov, and Auryan Sajjadi*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ABRAHAM BIELSKI, DZHURA BINYAMINOV, and AURYAN SAJJADI, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE, INC.,<br><br>Defendant. | Case No. 3:21-cv-07478-WHA<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. William H. Alsup<br><br>Action Filed: September 24, 2021<br><br>Trial Date: None set |

Plaintiffs Abraham Bielski, Dzhura Binyaminov, and Auryan Sajjadi (collectively, "Plaintiffs"), on behalf of themselves and all other similarly situated, by and through their attorneys, bring this class action against Defendant Coinbase, Inc. ("Coinbase").

**INTRODUCTION**

1.    This case is about holding Coinbase accountable for security failures on its platform—the largest cryptocurrency exchange in the country—that have left ordinary consumers holding the bag after sophisticated scammers repeatedly stole from them, all while Coinbase stood idly by and ignored their pleas for support.

2.    Defendant Coinbase, Inc. is a wholly-owned subsidiary of Coinbase Global, Inc., a publicly-traded company with a market capitalization of over $16 billion. Coinbase operates a platform allowing customers to open individual accounts, buy and sell cryptocurrency and fiat currency, and maintain their assets. It holds nearly $100 billion in customer assets on its platform, much of which is in small consumer accounts that seek to buy and hold fractions of cryptocurrency coins (such as Bitcoin) and electronically transfer U.S. dollars from their external personal bank accounts to fund cryptocurrency purchases on the Coinbase exchange.

3.    Coinbase represents that it will safeguard its customers' assets from theft and that it operates a secure, trusted platform. In exchange for its operation of a cryptocurrency exchange and its storage of customer assets, customers pay Coinbase significant commissions and fees. Coinbase reported a net revenue of nearly $2 billion in the first half of 2022.

4.    As the cryptocurrency market has boomed in popularity, Coinbase users have increasingly become the targets of hackers and scammers. These malicious actors have breached Coinbase's security and made unauthorized transfers of funds—both in the form of U.S. dollars or other "fiat currency," as well as in the form of cryptocurrencies—away from Coinbase user accounts into the hackers' or scammers' individual accounts or their virtual cryptocurrency "wallets" off of the Coinbase platform.

5.    The three Plaintiffs and members of the putative Classes have each fallen victim to these hacks and scams. But in response to widespread instances of unauthorized electronic fund

1 transfers on its exchange, Coinbase has done nothing for the vast majority of its affected users,

2 including Plaintiffs.[1]

3     6.    Because Coinbase is a "financial institution" as defined by the Electronic Funds

4 Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, it has a legal obligation to remedy unauthorized

5 electronic fund transfers. But it has not met that obligation because, for example, it has failed to timely

6 and in good faith investigate fraudulent transfers, and it has failed to timely credit and/or provisionally

7 recredit, or credit and/or provisionally recredit at all, Coinbase users' accounts pending investigation.

8     7.    In their attempts to secure compliance with this obligation, Coinbase users have

9 repeatedly implored Coinbase to help them rectify the unauthorized transfers from their accounts. But

10 in response, Coinbase has routinely and repeatedly ignored these requests, instead relying on

11 automated responses that have not specifically addressed user concerns and have not provided timely,

12 meaningful customer service.

13     8.    For over a year, and continuing today, Coinbase has largely turned a blind eye to the

14 systemic breaches of security on its exchange, leaving affected users without recourse (short of

15 litigation) to correct these issues. A CNBC article entitled, "Coinbase slammed for what users say is

16 terrible customer service after hackers drain their accounts," documents some of these users'

17 experiences with Coinbase.[2]

18     9.    Coinbase has further failed to comply with the EFTA and Regulation E of its

19 implementing regulations, 12 C.F.R. §§ 1005.1–.20, by failing to timely provide affected Coinbase

20 users with information concerning the status of the unauthorized electronic transfers from their

---

[1] Four days after this case was originally filed, Coinbase apparently refunded approximately 6,000 Coinbase users in the amount of the value of assets stolen from their accounts, valued at the time those assets were stolen. *See* First Amended Complaint, Dkt. 6, at Ex. A. For these users, Coinbase has acknowledged that the thefts from their accounts were a result of "third parties [who] took advantage of a flaw in Coinbase's SMS Account Recovery Process," and Coinbase apparently issued the refunds in response to its culpability. *Id.* These users are nonetheless included in the class definitions, as they due any unpaid compensatory damages (*e.g.*, the value of asset appreciation up to the time refunds were issued), as well as treble damages, statutory damages, attorneys' fees, costs, and interest. *See* 15 U.S.C. § 1693m(e) (safe harbor applies only to complete remedial action taken *before* an EFTA action is filed); *see also Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 985 (D. Minn. 2014).

[2] Scott Zamost *et al.*, *Coinbase slammed for what users say is terrible customer service after hackers drain their accounts*, CNBC, Aug. 24, 2021, https://www.cnbc.com/2021/08/24/coinbase-slammed-for-terrible-customer-service-after-hackers-drain-user-accounts.html.

1    accounts upon request, and it has failed to comply with Regulation E by failing to provide all Coinbase

2    users with initial disclosures required by Regulation E. Its failures to secure its customers' accounts

3    after promising to operate a safe and secure cryptocurrency exchange also give rise to a host of state

4    law claims.

5         10.    On behalf of two classes and two state-specific subclasses (as defined below), Plaintiffs

6    seek compensatory damages, statutory damages, treble damages, restitution, disgorgement, punitive

7    damages, attorneys' fees, costs of suit, interest, and any other relief the Court deems appropriate.

8                                        **JURISDICTION**

9         11.    The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331

10   because the action is brought pursuant to the Electronic Funds Transfer Act of 1978, 15 U.S.C. §§

11   1693 *et seq.* The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28

12   U.S.C. § 1367.

13        12.    The Court also has jurisdiction over this case pursuant to the Class Action Fairness

14   Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Coinbase

15   and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16                                          **VENUE**

17        13.    This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b) and (c)

18   because a substantial part of the events or omissions giving rise to the claims occurred in this District,

19   and Coinbase has substantial and systematic contacts in the District as alleged within this Complaint.

20        14.    The case has been properly assigned to the San Francisco Division of this District

21   under Civil L.R. 3-2(c) and (d) because a substantial part of the events or omissions that gave rise to

22   Plaintiffs' claims occurred in San Francisco County.

23                                         **PARTIES**

24        15.    Plaintiff Abraham Bielski is a Coinbase customer. He is a citizen of Florida.

25        16.    Plaintiff Dzhura Binyaminov is a Coinbase customer. He is a citizen of New York.

26        17.    Plaintiff Auryan Sajjadi is a Coinbase customer. He is a citizen of California.

27        18.    Defendant Coinbase, Inc. is a Delaware company in the business of, among other

28   things, operating cryptocurrency exchanges and other related businesses around the world via its

website and cellular phone applications. Coinbase operates the largest cryptocurrency exchange in the United States by trading volume and claims to have over 103 million verified users with $96 billion of assets on its platform. While Coinbase purports to have no physical headquarters, it has its principal place of business in San Francisco, California, maintains its executive offices in San Francisco, California, is registered with the Secretary of State in California, has an agent for service of process in California, and, on information and belief, pays taxes to the State of California.

## FACTS

**A.   The cryptocurrency market has exploded in size and popularity.**

19.   Cryptocurrencies are digital assets that are backed by decentralized computer networks, rather than by central banks or issuing authorities like fiat currencies such as the U.S. dollar, the Mexican peso, or the Euro. The largest and perhaps most well-known example of a cryptocurrency is Bitcoin, which was launched in 2009.

20.   Unlike traditional fiat currencies that have the support of governments, cryptocurrencies rely on digital ledgers, which are public databases that contain the entire ownership and transaction history of every cryptocurrency "coin." The information in these ledgers cannot be maliciously edited by a third party. These secure ledgers—combined with a finite supply of available "coins"—allow cryptocurrencies to function as a storage of value, like other funds or assets. Because the "coins" have real-world value, they are often bought and sold in exchange for fiat currency or for other cryptocurrency coins.

21.   Cryptocurrency's popularity has skyrocketed in a short time, and the value of some cryptocurrencies has also risen dramatically. In 2010, a customer bought two pizzas for the price of 10,000 Bitcoin;[3] as of October 27, 2022, a single Bitcoin was worth over $20,000. The total market capitalization of all cryptocurrencies was estimated to exceed $2 trillion earlier this year.

---

[3] Rufas Kamau, *What Is Bitcoin Pizza Day, And Why Does The Community Celebrate On May 22?*, Forbes, May 9, 2022, https://www.forbes.com/sites/rufaskamau/2022/05/09/what-is-bitcoin-pizza-day-and-why-does-the-community-celebrate-on-may-22/?sh=7cd8b56fd685.

22.     This dramatic growth in cryptocurrency has been fueled largely by ordinary American consumers, who have treated cryptocurrency like other traditional, tradeable, appreciating assets such as stocks and bonds.

**B.     Coinbase has played a major role in the rise of cryptocurrency trading.**

23.     To trade cryptocurrencies, consumers rely on a novel form of financial institution that both stores consumers' funds and assets as well as provides a platform for the exchange of those funds and assets on the open market.

24.     The most prominent of this new type of financial institution is Coinbase. Combining the features of financial institutions like brokerages and stock exchanges, Coinbase is a custodian for its customers' funds and an operator of a cryptocurrency exchange on which customers may buy, sell, and trade cryptocurrencies directly on the Coinbase platform.

25.     Coinbase was founded in 2012 and has since grown into one of the biggest names in cryptocurrency. At its initial public offering in 2021, Coinbase's value was reportedly $47 billion. Today, Coinbase claims more than 103 million customers with trades totaling more than $200 billion per quarter, all on a Coinbase platform supported by nearly 5,000 employees.

26.     Coinbase focuses its business on ordinary retail investors. Its business model depends on persuading ordinary consumers to sign up to trade cryptocurrency, and it is aware of its niche in the "retail crypto" space. Coinbase's 2021 annual report touted its "simple onboarding process that allows retail users to sign up and quickly purchase their first crypto asset" and claimed that Coinbase is "a primary on-ramp for customers' journeys into the cryptoeconomy."

27.     Regular consumers across the country have bought and sold cryptocurrencies after Coinbase targeted its marketing toward them. For example, Coinbase spent an estimated $13 million to broadcast a one-minute commercial nationwide on NBC during the Super Bowl in February 2022.[4]

28.     In furtherance of its "retail crypto" efforts, Coinbase encourages users to invest their retirement savings in cryptocurrency through web advertisements like "The Crypto Guide to

---

[4] Gabe Lacques, *What was that? Coinbase's QR code Super Bowl commercial confuses viewers*, USA Today, Feb. 13, 2022, https://www.usatoday.com/story/sports/Ad-Meter/2022/02/13/coinbase-qr-code-super-bowl-ad-crypto-commercial-confuses-viewers/6778949001/.

Retirement Savings." Coinbase even partners with 401(k) plan provider ForUsAll to encourage users to invest their retirement savings in the cryptocurrency market.

### C. Coinbase has repeatedly made false representations about its platform's security.

29.     As a financial institution, Coinbase understands that its platform will only succeed if would-be customers believe their assets and funds are secure on the Coinbase platform. To that end, Coinbase's website is replete with representations about the safety and security of Coinbase users' assets. The front page of its website, www.coinbase.com, represents that users can "[s]imply and securely buy, sell, and manage hundreds of cryptocurrencies" and that it provides "accessible, safe, and secure financial tools for everyone."

30.     On its website, Coinbase lays out myriad representations about its safety and security, underneath messages like "Here's why you can trust us:" and "Most trusted. Most secure." Coinbase represents that its cryptocurrency storage is secure, that it offers "best in class storage," that it has "industry-leading security," that it is the "most trusted crypto exchange," that it uses "state-of-the-art encryption," that its users' "assets are protected," that it offers "multifaceted risk management programs designed to protect customers' assets," that it "offer[s] the finest tools to protect your account," and that its users can "[g]et the help you need, when you need it" from its Support Team, in addition to other representations about safety and security. Many of these representations are in oversized and/or bold-faced and are featured prominently on Coinbase's website.

31.     Coinbase's representations about its purported safety and security have been made about each aspect of its services. Coinbase claims that its "Wallet" will "[p]rotect your digital assets with industry-leading security," that its "trusted and easy-to-use" platform allows "anyone, anywhere . . . to easily and securely send and receive Bitcoin," that it will "[p]rotect your crypto with best in class cold storage," and that its users can "[s]afely store and easily view" their assets.

32.     Coinbase has published these representations beyond its own website. It has made representations about its purported security through search engine marketing, social media, media interviews, and other marketing materials. When a would-be customer searches for "Coinbase" on Google, the link to the first result—Coinbase's website—describes it as a place to "Buy and Sell

Bitcoin, Ethereum, and more with trust." Coinbase's Twitter account has claimed that it "provid[es] the safest and most secure crypto experience to our users"[5] and tells potential customers that Coinbase is "[t]he safest place for your crypto."[6] Its Twitter account has also represented to its users (and would-be users) that "[f]irst (and most importantly) your funds are safe, and they always will be."[7]

33.    Plaintiffs read Coinbase's representations about its safety and security measures and relied on those representations in purchasing, trading, and storing cryptocurrency on the Coinbase platform.

**D.    Coinbase has admitted that it must provide "bank-level security" and is well-aware of its platform's vulnerabilities.**

34.    Coinbase recently admitted to its investors that it is required by law to provide bank-level security for its customers' funds. In an August 2022 disclosure statement to the SEC, Coinbase's parent company represented that "we are required to safeguard customers' assets using bank-level security standards applicable to our wallet and storage systems, as well as our financial management systems related to such custodial functions."[8] Despite this acknowledgement, Coinbase has failed and continues to fail to do so.

35.    Coinbase's acknowledgement that it is "required" to "safeguard" assets using "bank-level security standards" shows its awareness of its obligations to comply with the EFTA and Regulation E, to not breach the duty of care that it owes to its customers, and to act reasonably as a bailee of its customers' personal property.

36.    Coinbase has also admitted to its strategic purposes in repeatedly representing its platform is secure (even without "bank-level security standards"). On May 10, 2022, in a quarterly earnings call, Coinbase CEO and co-founder Brian Armstrong explained that Coinbase makes broad

---

[5] Coinbase (@coinbase), Twitter (June 30, 2022, 1:25 PM ), www.twitter.com/coinbase/status/1542605323382337537.

[6] Coinbase (@coinbase), Twitter (July 2, 2021, 8:09 AM), www.twitter.com/coinbase/status/1410979060868517889.

[7] Coinbase (@coinbase), Twitter (May 11, 2022, 4:34 PM), www.twitter.com/coinbase/status/1524533348474912769.

[8] Coinbase Global, Inc., Quarterly Report (Form 10-Q), at 94 (Aug. 9, 2022), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978822000085/coin-20220630.htm.

1   representations about its safety and security features in order to form a "competitive moat" and gain

2   an advantage over competitors in the cryptocurrency industry.[9] By representing that customer funds

3   are safe on its platform, Coinbase seeks to induce potential customers to sign up there (rather than

4   with a competitor) and pay Coinbase fees for cryptocurrency transactions. During that same call,

5   Armstrong emphasized the importance of the perception of security for Coinbase's success:

> It comes down to cybersecurity – we're storing more crypto securely
> for our customers. And so whenever people are coming into a new
> industry, they generally want to go with the one that it's been around
> the longest, it's trusted by the most people, it has the most number of
> users. Coinbase is really the only crypto company that's public in this
> environment. And we're storing such a large amount of crypto that I
> think that's a defensible moat because basically **when people trust us,
> they store crypto with us.**

(Emphasis added.)

37.    Despite Coinbase's acknowledgement that the *perception* of security is crucial to its success, it has failed and continues to fail to actually secure its customers' funds or to resolve errors resulting from breaches in the security of its customers' funds.

38.    Coinbase has admitted to an awareness of the dangers that hackers and scammers pose to its users. In its 2021 Form 10-K, Coinbase acknowledged that a "risk factor" to its business was "cyberattacks and security breaches of our platform, or those impacting our customers or third parties" because they "could adversely impact our brand and reputation and our business, operating results, and financial condition."[10]

39.    These issues with cryptocurrency security are widely known. Michael Hsu, the acting Comptroller of the Currency, recently decried the "unabating volume of scams, hacks, and fraud" in cryptocurrency and urged caution about allowing cryptocurrency to interact directly with more traditional financial institutions.[11] Hsu said that "people get hurt" when cryptocurrency peddlers, like

---

[9] Coinbase Global, Inc. First Quarter 2022 Earnings Call (May 10, 2022), available at
https://s27.q4cdn.com/397450999/files/doc_financials/2022/q1/Coinbase-Q1'22-Earnings-Call-
Transcript.pdf.

[10] Coinbase Global, Inc. 2021 Annual Report (Form 10-K), at 26 (Feb. 24, 2022), available at
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001679788/000167978822000031/coin-
20211231.htm.

[11] Jon Hill, *'People Get Hurt' When Crypto Mimics Banks, OCC's Hsu Says*, Law360, Oct. 11, 2022,

1  Coinbase, use "familiar" terminology to "downplay or mask the risks involved" in trading

2  cryptocurrencies.[12]

3        40.    These issues also disproportionately affect Coinbase and its customers, because

4  Coinbase has pursued the "retail crypto" business strategy to take advantage of unwary consumers.

5  The cyber security firm PIXM explained that Coinbase has been "increasingly targeted by scammers,

6  fraudsters, and cyber criminals" because these malicious actors understand Coinbase attracts an

7  "audience of casual, generally non-technical, crypto investors" who are especially susceptible to their

8  schemes.[13]

9        41.    Coinbase continues to use familiar bank-like language about security in order to attract

10  these casual, non-technical retail customers. As Coinbase has acknowledged on multiple occasions, its

11  representations regarding security are material to consumers and are important in Coinbase's attempt

12  to maintain a competitive edge over its competitors. Gaining the trust of ordinary consumers by

13  marketing its platform as the "most secure" is central to Coinbase's brand and competitive strategy.

14        42.    Despite these representations, which Coinbase makes for its own business benefit,

15  Plaintiffs and the Class have been victimized by Coinbase's lax security measures and have been left

16  helpless after Coinbase's Support Team refused to meaningfully assist them.

17        **E.    Abraham Bielski was victimized, and Coinbase refused to help.**

18        43.    Plaintiff Abraham Bielski opened an account with Coinbase for the purpose of buying

19  and selling cryptocurrencies for his personal use.

20        44.    On September 8, 2021, Bielski realized that an unauthorized electronic transfer had

21  been made from his Coinbase account to an unknown third party. The third party had electronically

22  transferred funds totaling more than $31,000 out of his account.

23

24

25  ────────────
    https://www.law360.com/consumerprotection/articles/1538955/-people-get-hurt-when-crypto-
26  mimics-banks-occ-s-hsu-says.

    [12] *Id.*

27  [13] Karen Hoffman, *Coinbase phishing hack signals more crypto attacks to come, says security firm*, SC Magazine
28  (Aug. 5, 2022), https://www.scmagazine.com/analysis/email-security/coinbase-phishing-hack-
    signals-more-crypto-attacks-to-come-says-security-firm.

1    45.    Bielski immediately notified Coinbase customer service of the unauthorized transfer,

2    but customer service did not make any good faith efforts to engage with him about his dispute or

3    otherwise attempt to resolve the dispute, one way or another, in a good faith manner.

4    46.    Bielski has not been refunded any of his funds by Coinbase, and Bielski is informed

5    and believes that neither he nor any other member of any class as defined herein have received the

6    full relief sought in this action.

7    47.    Bielski did not receive a disclosure from Coinbase including the information required

8    by 12 C.F.R. § 1005.7 before the first electronic fund transfer was made involving his Coinbase

9    account.

10   **F.    Dzhura Binyaminov was victimized, and Coinbase refused to help.**

11   48.    Plaintiff Dzhura Binyaminov opened an account with Coinbase for the purpose of

12   buying and selling cryptocurrencies for his personal use.

13   49.    On January 31, 2022, Binyaminov realized that an unauthorized electronic transfer had

14   been made from his Coinbase account to an unknown third party. The third party electronically

15   transferred funds totaling approximately $38,000 out of his account.

16   50.    Binyaminov immediately notified Coinbase customer service of the unauthorized

17   transfer, but customer service did not make any good faith efforts to engage with him about his dispute

18   or otherwise attempt to resolve the dispute, one way or another, in a good faith manner.

19   51.    Binyaminov has not been refunded any of his funds by Coinbase, and Binyaminov is

20   informed and believes that neither he nor any other member of any class as defined herein have

21   received the full relief sought in this action.

22   52.    Binyaminov did not receive a disclosure from Coinbase including the information

23   required by 12 C.F.R. § 1005.7 before the first electronic fund transfer was made involving his

24   Coinbase account.

25   **G.    Auryan Sajjadi was victimized, and Coinbase refused to help.**

26   53.    Plaintiff Auryan Sajjadi opened an account with Coinbase for the purpose of buying

27   and selling cryptocurrencies for his personal use.

28

54.     On June 7, 2022, Sajjadi realized that an unauthorized electronic transfer had been made from his Coinbase account to an unknown third party. The third party had electronically transferred funds totaling approximately $30,000 out of his account.

55.     Sajjadi immediately notified Coinbase customer service of the unauthorized transfer, but customer service did not make any good faith efforts to engage with him about his dispute or otherwise attempt to resolve the dispute, one way or another, in a good faith manner.

56.     Sajjadi has not been refunded any of his funds by Coinbase, and Sajjadi is informed and believes that neither he nor any other member of any class as defined herein have received the full relief sought in this action.

57.     Sajjadi did not receive a disclosure from Coinbase including the information required by 12 C.F.R. § 1005.7 before the first electronic fund transfer was made involving his Coinbase account.

**H.     Plaintiffs Bielski, Binyaminov, and Sajjadi are far from alone.**

58.     More Coinbase users in addition to Plaintiffs have suffered and continue to suffer financial losses as a result of unauthorized electronic transfers from their Coinbase accounts.

59.     Coinbase users have shared their stories on social media websites including Twitter and Reddit. On Twitter, one user described how his Coinbase account was "hacked" and Coinbase "won't help."[14] He explained that Coinbase told him he "would get the money back" that he lost in the hack, but instead his funds disappeared and Coinbase offered no support—forcing him instead to ask the FBI to intervene.[15] On Reddit, multiple Coinbase users have complained of stolen funds through unauthorized electronic fund transfers, each with no help from Coinbase's Support Team.[16]

---

[14] John Layfield (@JCLayfield), Twitter (Jan. 13, 2022, 7:40 AM), www.twitter.com/jclayfield/status/1481652273793028106.

[15] John Layfield (@JCLayfield), Twitter (Feb. 25, 2022, 11:28 AM), https://www.twitter.com/jclayfield/status/1497292461730938886.

[16] *See, e.g., What will Coinbase do to correct hacked account/stolen money?*, Reddit, https://www.reddit.com/r/CoinBase/comments/xop5on/what_will_coinbase_do_to_correct_hacked/; *Account was hacked. My money was stolen.*, Reddit, https://www.reddit.com/r/CoinBase/comments/tf7vni/account_was_hacked_my_money_was_stolen/; *Coinbase account hacked and all stolen*, Reddit, https://www.reddit.com/r/CoinBase/comments/s9osxr/coinbase_account_hacked_and_all_stolen/ (all last accessed Oct. 27, 2022).

60.     Media reports about Coinbase users falling victim to unauthorized electronic transfers are common, with titles like "Katy man out of about $17K after his cryptocurrency account was hacked,"[17] "Couple's digital Coinbase account hacked, $24,000 stolen,"[18] and "Hackers drain cryptocurrency accounts of thousands of Coinbase users."[19]

61.     Additional similar lawsuits have sprung up across the country since this case was first filed, with plaintiffs levying similar allegations in putative class actions against Coinbase. *See, e.g.,* *Aggarwal v. Coinbase, Inc.*, No. 4:22-cv-04829-JSW (N.D. Cal.); *Kattula v. Coinbase Global, Inc.*, No. 1:22-cv-03250-TWT (N.D. Ga.).

## CLASS ACTION ALLEGATIONS

62.     This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23.

63.     Plaintiffs seek certification of a class (the "Class") with respect to Claims 1, 2, 4, 5, 6, 7, 8, 9, and 12 that is composed of and defined as follows:

> All current and former Coinbase users and/or consumers in the United States who maintained funds, including but not necessarily limited to cryptocurrency and/or fiat currency, in their Coinbase account(s) and who had funds removed from their account(s) as a result of unauthorized electronic fund transfer(s) at least as recently as the one-year period immediately preceding the filing of this action.

64.     Plaintiff Abraham Bielski seeks certification of a Florida Subclass with respect to Claim 10, brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), that is composed of and defined as follows:

> All current and former Coinbase users and/or consumers in the State of Florida who maintained funds, including but not necessarily limited to cryptocurrency and/or fiat currency, in their Coinbase account(s) and who had funds removed from their account(s) as a result of

---

[17] Courtney Carpenter, *Katy man out of about $17K after his cryptocurrency account was hacked*, ABC13 KTRK-TV (Feb. 1, 2022), available at www.abc13.com/coinbase-cryptocurrency-hacked-robbed/11530402/.

[18] Lara Greenberg, *Couple's digital Coinbase account hacked, $24,000 stolen*, FOX35 WOFL-TV (Dec. 6, 2021), available at www.fox35orlando.com/news/couples-digital-coinbase-account-hacked-24000-stolen.

[19] Jorge Jiminez, *Hackers drain cryptocurrency accounts of thousands of Coinbase users*, PC Gamer (Oct. 4, 2021), available at www.pcgamer.com/hackers-drain-cryptocurrency-accounts-of-thousands-of-coinbase-users/.

1                unauthorized electronic fund transfer(s) at least as recently as the one-
year period immediately preceding the filing of this action.

2

3           65.     Plaintiff Dzhura Binyaminov seeks certification of a New York Subclass with respect

to Claim 11, brought pursuant to New York General Business Law § 349, that is composed of and

4
defined as follows:

5
                All current and former Coinbase users and/or consumers in the State

6                of New York who maintained funds, including but not necessarily
limited to cryptocurrency and/or fiat currency, in their Coinbase

7                account(s) and who had funds removed from their account(s) as a
result of unauthorized electronic fund transfer(s) at least as recently as

8                the one-year period immediately preceding the filing of this action.

9           66.     Plaintiffs seek certification of a Notice Requirement Class with respect to Claim 3,

10  brought pursuant to 15 U.S.C. § 1693c and Regulation E, 12 C.F.R. § 1005.7, that is composed of and

11  defined as follows:

12               All current and former Coinbase users and/or consumers in the
United States with Coinbase account(s) active at least as recently as the

13               one-year period immediately preceding the filing of this action.

14           67.     Excluded from the Class, the Florida Subclass, the New York Subclass, and the Notice

15  Requirement Class (collectively, the "Classes") are Coinbase's officers and directors and current or

16  former employees of Coinbase and their immediate family members, as well as any judge, justice, or

17  judicial officer presiding over this matter and the members of their immediate families and staff.

18           68.    **Ascertainability.** Plaintiffs are informed and believe that the identities of members

19  of the Classes are ascertainable through Coinbase's records.

20           69.    **Numerosity.** Plaintiffs are informed and believe that there are thousands of members

21  of the Class and the Notice Requirement Class. The Classes are so large that the joinder of all of their

22  members is impracticable. The exact number of members of each of the four Classes can be

23  determined from information in the possession and control of Coinbase.

24           70.    **Commonality.** Coinbase has acted or refused to act on grounds that apply generally

25  to the Classes, including its failure to secure consumer accounts, its inaccurate representations about

26  their products made to the public and members of the Classes, its failure to provide meaningful

27  customer service related to security breaches, its failure to remedy unauthorized electronic fund

28  transfers, and its failure to provide adequate initial disclosures under Regulation E. Absent certification

of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Coinbase. Numerous common issues of fact and law exist, including, without limitation:

a.  Whether Coinbase has complied with the investigation and error resolution requirements of the EFTA and/or Regulation E in connection with the unauthorized electronic transfer of funds from the accounts of Plaintiffs and the Classes;

b.  Whether Coinbase has made timely, good faith investigations of unauthorized electronic fund transfers, or has not had a reasonable basis for believing the accounts of Plaintiffs and the Classes were not in error, or has knowingly and willfully concluded that those accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to Coinbase at the time of its investigation, if any;

c.  Whether Coinbase has timely complied with the customer service provisions of the EFTA and/or Regulation E in connection with the unauthorized electronic transfer of funds from the accounts of Plaintiffs and the Classes;

d.  Whether Coinbase has complied with the disclosure requirements of the EFTA and/or Regulation E with respect to Plaintiffs and the Notice Requirement Class;

e.  Whether Coinbase is subject to the legal requirements described in (a)–(d);

f.  The nature, extent, policies, and procedures of the customer service or "Support" processes that Coinbase makes available for its customers relating to security breaches or unauthorized electronic fund transfers;

g.  The nature, extent, policies, and procedures of the security measures that Coinbase takes to protect its customers' accounts and prevent security breaches or unauthorized electronic fund transfers;

h.  The legal sufficiency of the facts relating to (f)–(g) as applied to the claims of Plaintiffs and the Classes;

i.  Whether Coinbase was aware, or should have been aware; of potential vulnerabilities in its customer account security;

j.      The nature, scope, extent, and any limitations to the obligations that Coinbase owes to depositors and users of its platform and exchange;

k.      Whether a customer's decision to deposit and maintain funds or assets on Coinbase's platform, and Coinbase's decision to accept those funds or assets, forms a bailment;

l.      Whether Coinbase failed to properly secure its customers' accounts, funds, cryptocurrency, or other assets;

m.      Whether Coinbase owed a duty of care to safely maintain the accounts, funds, cryptocurrency, or other assets in its customers' accounts;

n.      Whether Coinbase violated the duties of care it owed to Plaintiffs and the Classes;

o.      Whether Coinbase's representations about the safety and security of its platform and exchange were materially false and misleading, or whether Coinbase made those representations negligently, carelessly, or recklessly with regard to their falsity;

p.      Whether Plaintiffs and the Classes were harmed by the security breaches resulting in unauthorized electronic fund transfers from their Coinbase accounts;

q.      Whether Coinbase is a "securities intermediary" under California law, and if so, whether the unauthorized electronic fund transfers were ineffective entitlement orders;

r.      Whether Coinbase should have to repay the monies lost by Plaintiffs and the Classes;

s.      Whether Coinbase should be required to make restitution to Plaintiffs and the Classes;

t.      Whether Coinbase should be disgorged of monies that it received as ill-gotten gains;

u.      Whether Coinbase should be required to pay damages to Plaintiffs and members of the Classes, including treble damages where available by law;

v.      Whether exemplary or punitive damages should be assessed against Coinbase.

71.     **Typicality.** Plaintiffs' claims are typical, if not identical, to the claims that could be asserted by all members of the Class and the Notice Requirement Class. Plaintiffs' claims arise from Coinbase's practices applicable to all such class members. Plaintiff Abraham Bielski's claims are typical, if not identical, to the claims that could be asserted by all members of the Florida Subclass. Plaintiff Dzhura Binyaminov's claims are typical, if not identical, to the claims that could be asserted by all members of the New York Subclass.

72.     **Adequacy.** Plaintiffs are all members of the Class and the Notice Requirement Class and will adequately represent the interests of those class members because there are no conflicts between Plaintiffs and those class members, and because Plaintiffs' counsel has the experience and skill to zealously advocate for the interests of the members of the Classes. Plaintiff Abraham Bielski is a member of the Florida Subclass and will adequately represent the interests of those subclass members. Plaintiff Dzhura Binyaminov is a member of the New York Subclass and will adequately represent the interests of those subclass members.

73.     **Predominance.** Common issues predominate over individualized inquiries in this action because Coinbase's liability can be established as to all members of the Classes as discussed herein. *See supra* ¶ 70.

74.     **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as the Classes superior to any alternatives, including that it will provide a realistic means for members of the Classes to recover damages; the damages suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiffs know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CLAIMS

## CLAIM 1
## VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT
### 15 U.S.C. §§ 1693 *et seq.*
### On Behalf of All Class Members

75. Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

**A.      The EFTA's legal framework is broad.**

76. The EFTA and its corresponding regulations implemented by the Consumer Financial Protection Bureau ("CFPB"), 12 C.F.R. §§ 1005.1 *et seq.*, were designed with the "primary objective" of "the provision of individual consumer rights." 15 U.S.C. § 1693; 12 C.F.R. § 1005.1(b) (The "primary objective of the act and this part is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.").

77. Relevant definitions throughout the EFTA and its corresponding definitions include:

a.      A "financial institution" includes banks and credit unions, as well as "any other person who, directly or indirectly, holds an account belonging to a consumer." 15 U.S.C. § 1693a(9). A "person" includes "a natural person or an organization, including a corporation . . . ." 12 C.F.R. § 1005.2(j).

b.      An "account" includes any consumer asset account held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes. 15 U.S.C. § 1693a(2); *see also* 12 CFR § 1005.2(j).

c.      A "consumer" is a "natural person." 15 U.S.C. § 1693a(6).

d.      An "error" includes, among other things, an "unauthorized electronic fund transfer." 15 § 1693f(f)(1); 12 C.F.R. § 1005.11(a)(vii).

e.      An "unauthorized electronic fund transfer" is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693(a)(12); *see also* 15 C.F.R. § 1005(m). The CFPB (as well as the Board of Governors of the Federal Reserve System) have specifically stated that "[a]n unauthorized

[electronic funds transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery." *See* 12 C.F.R. § 205, Supp. I at 2(m) (Board of Governors' Official Interpretation of § 205.2(m)); 12 C.F.R. § 1005, Supp. I at 2(m) (CFPB's Official Interpretation of § 1005.2(m)); *see also Green v. Capital One, N.A.*, 557 F. Supp. 3d 441, 446–50 (S.D.N.Y. 2021).[20]

       f.     An "electronic fund transfer" includes any transfer of funds initiated through a computer. While the definition does not include any transfer of funds the primary purpose of which is the purchase or sale of a security or commodity, if the security or commodity is regulated by the Securities and Exchange Commission ("SEC") or the Commodity Futures Trading Commission ("CFTC") or is purchased or sold through a broker-dealer regulated by the SEC or through a future commission merchant regulated by the CFTC, the "primary purpose" of the transfers of funds at issue in this action is not the purchase or sale of a security or commodity, but rather outright theft. Indeed, CFPB has made clear that this "Securities Exemption" applies to, for example, a transfer initiated by a telephone order to a stockbroker to buy or sell securities or to exercise a margin call, but not a transfer involving an access device that accesses a securities or commodities account that a consumer uses for purchasing goods or services or for obtaining cash (*i.e.*, a Coinbase account). 12 C.F.R. § 1005, Supp. I at 3(c)(4).

       78.     The error resolution subpart of the EFTA provides, in relevant part, that if a financial institution, within sixty days after having transmitted to a consumer notice of an electronic funds transfer, receives oral or written notice in which the consumer (1) sets forth or otherwise enables the financial institution to identify the name and account number of the consumer; (2) indicates the consumer's belief that the documentation, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief that an error has occurred, the financial institution

---

[20] The definition of "unauthorized electronic fund transfer" under § 1693a(12) and § 1005(m) excludes any electronic fund transfer initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer. The CFPB and Board of Governors have confirmed that this exclusion does not encompass situations where a consumer technically furnishes to a third party his or her means of access to an account, but due to fraud, threat, or force.

1    must investigate the alleged error, determine whether an error has occurred, and report or mail the

2    results of such investigation and determination to the consumer within ten business days. 15 U.S.C. §

3    1693f(a)(3); *see* 12 C.F.R § 205.11; *see also* Supp. I to § 205 at 11(b)(1) (notice of error is effective so

4    long as the financial institution is able to identify the account in question); 12 C.F.R. § 1005, Supp. I

5    at 11(b)(1)(1) (same). Notice may be constructive "when the institution becomes aware of

6    circumstances leading to the reasonable belief that an unauthorized transfer to or from the consumer's

7    account has been or may be made." 12 C.F.R. § 1005.6(b)(5)(iii).

8         79.     If the financial institution determines that an error did occur, it has the option to either

9    (1) timely correct the error, including the crediting of interest where applicable; or (2) timely

10   provisionally recredit the consumer's account for the amount alleged to be in error pending the

11   conclusion of the institution's investigation of the error within ten business days of being notified of

12   the error. 15 U.S.C. § 1693f(c); *see also* 12 C.F.R. § 1005.11. In no circumstance can an investigation be

13   concluded more than forty-five days after receipt of the notice of error, and during the pendency of

14   the investigation, the consumer must be allowed full use of funds provisionally recredited. *Id.*

15        80.     Where a financial institution (1) fails to provisionally recredit a consumer's account

16   within the ten-day period specified above, and the financial institution (a) did not make a good faith

17   investigation of the alleged error, or (b) did not have a reasonable basis for believing that the

18   consumer's account was not in error; or (2) knowingly and willfully concludes that a consumer's

19   account was not in error when such conclusion could not reasonably have been drawn from the

20   evidence available to the financial institution at the time of its investigation, then the consumer shall

21   be entitled to treble damages determined under 15 U.S.C. § 1693m(a)(1).

22        81.     The consumer may be held liable for an unauthorized electronic fund transfer where

23   a financial institution provides the required notices under 15 U.S.C. § 1693c and 12 C.F.R. § 1005.7(b).

24   15 U.S.C. § 1693g; 12 C.F.R. § 1005.6. Liability of the consumer, if applicable, is limited to $50 if the

25   consumer notifies the institution within two business days after learning of the loss or $500 if the

26   consumer does not notify the institution within two business days after learning of the loss. *Id.*

27

28

**B.     Coinbase is subject to the EFTA.**

82.     Coinbase is a "financial institution" as defined by the EFTA because it is a corporation that holds accounts belonging to consumers, including Plaintiffs and the Class. Coinbase provides users with (a) hosted Digital Currency wallet(s) for holding digital currencies, and (b) hosted U.S. Dollars wallet(s) for holding U.S. dollars.

83.     Plaintiffs and the Class are "consumers" as defined by the EFTA because they are natural persons.

84.     The Coinbase accounts held by Plaintiffs and the Class are "accounts" as defined by the EFTA and/or Regulation E, 12 C.F.R. §§ 1005.1–.20, because they are asset accounts held directly by Coinbase and established primarily for personal, family, or household purposes. The Coinbase accounts held by Plaintiffs and the Class are used for such those purposes—*i.e.*, intended to earn income from appreciating assets—and not for business purposes.

85.     The electronic fund transfers at issue have been "unauthorized electronic fund transfers" because they were initiated by a person other than Plaintiffs or the Class by fraud, without actual authority to initiate such transfers, and from which Plaintiffs and the Class have received no benefit. The primary purpose of these transfers has not been the purchase or sale of securities or commodities, but rather to steal securities or commodities.

86.     Plaintiffs and the Class have provided timely actual and/or constructive notice to Coinbase of the unauthorized electronic transfers from their accounts. Indeed, Coinbase knew or should have known of the repeated and widespread breaches of its security and subsequent theft of funds, as well as the repeated and widespread requests for assistance from Plaintiffs and the Class. Coinbase should have been aware of and prepared to handle inquiries concerning unauthorized electronic transfers from the Coinbase accounts of Plaintiffs and the Class, and it should have taken steps to monitor those accounts for unauthorized transfers.

87.     Coinbase has failed to timely and in good faith investigate the unauthorized electronic transfers from the Coinbase accounts of Plaintiffs and the Class, as required by 15 U.S.C. §§ 1693f(a)(3) and 1693f(d), because it failed to conduct a timely and reasonable review of its own records. *See* 12 C.F.R. § 205.11(c)(4); *see also* Supp. I to § 205 at 11(c)(4)–5. Indeed, adequate and timely

1  investigations would have easily led Coinbase to the conclusion that fraud had occurred, given that

2  Plaintiffs and the Class have not authorized the transfers at issue, that the fraudulent transfers have

3  been made to accounts other than those Plaintiffs and the Class used to fund their Coinbase accounts,

4  and that these fraudulent transfers have been widely reported as a common issue on the Coinbase

5  exchange. Accordingly, Plaintiffs and the Class are entitled to compensatory damages, attorneys' fees,

6  and costs for Coinbase's inadequate investigation pursuant to 15 U.S.C. § 1693m(a).

7       88.     Further, Coinbase has failed to timely correct the "errors" (as noted above, statutorily

8  defined to include "unauthorized electronic fund transfers"), or to correct the "errors" at all, in the

9  Coinbase accounts of Plaintiffs and the Class. Coinbase failed to timely credit or provisionally recredit

10  those accounts, or failed to credit or provisionally recredit those accounts at all, after those accounts

11  had been breached and drained of funds. 15 U.S.C. § 1693f(b)–(c). This failure, separately, results in

12  compensatory damages owed to Plaintiffs and the Class pursuant to 15 U.S.C. § 1693m(a). In addition,

13  because Coinbase never provided disclosures compliant with 12 C.F.R. § 1005.7(b) to Plaintiffs or the

14  Class, Plaintiffs and the Class have no liability for the unauthorized electronic fund transfers under 15

15  U.S.C. § 1693g and/or 12 C.F.R. § 1005.6.

16       89.     Because Coinbase has not timely provisionally recredited, or provisionally recredited

17  at all, the Coinbase accounts of Plaintiffs and the Class, and because Coinbase failed to conduct timely,

18  good faith investigations into the unauthorized transactions that Plaintiffs and the Class have actually

19  or constructively reported (by, for example, failing to provide Plaintiffs and the Class reasonable access

20  to timely and effective customer service or otherwise engaging in any sort of good faith investigation

21  of unauthorized electronic fund transfers), Coinbase is liable for treble damages under the EFTA.

22       90.     Coinbase is further liable for treble damages under the EFTA because it has not had

23  a reasonable basis for believing the Coinbase accounts of Plaintiffs and the Class were not in "error."

24  Instead, Coinbase failed to use the resources and procedures necessary to timely resolve, or resolve at

25  all, the fraud that has been occurring on those accounts, demonstrating that Coinbase has been unable

26  or unwilling to timely form, or form at all, a reasonable basis for believing those accounts were not in

27  "error." Moreover, to the extent Coinbase has concluded that the Coinbase accounts of Plaintiffs and

28  the Class accounts were not in "error," Coinbase has knowingly and willfully reached that conclusion

1  when it could not reasonably have been drawn from the evidence available to Coinbase at the time of

2  any investigation.

3       91.     Plaintiffs and the Class are therefore entitled to compensatory damages, attorneys'

4  fees, and costs for this claim under 15 U.S.C. § 1693m, as well as treble damages under 15 U.S.C. §

5  1693f(e).

6                                    **CLAIM 2**
   **VIOLATION OF EFTA AND REGULATION E CUSTOMER SERVICE PROVISIONS**
7        **15 U.S.C. § 1693f(f)(6); 12 C.F.R. § 1005.11(a)(7)**
                    **On Behalf of All Class Members**

8       92.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth

9
10  herein.

11      93.     The EFTA, 15 U.S.C. § 1693f(f)(6), and Regulation E, 12 C.F.R. § 1005.11(a)(7), (c),[21]

12  require financial institutions to address "a consumer's request for additional information or

13  clarification concerning an electronic fund transfer" within ten business days of receiving notice of

14  error, or within 45 calendar days if the financial institution provisionally recredits the consumer's

15  account, with interest where applicable, within ten business days of receiving the notice of error.

16      94.     Plaintiffs and the Class are "consumers" within the meaning of the EFTA and

17  Regulation E.

18      95.     Coinbase, a "financial institution," has violated the EFTA and Regulation E by failing

19  to timely provide information or clarification concerning electronic fund transfers, including requests

20  made by Plaintiffs and the Class to determine whether there were unauthorized electronic transfers

21  from their Coinbase accounts. *See* U.S.C. § 1963f(f)(6); 12 C.F.R. § 1005.11.

22      96.     Coinbase is liable to Plaintiffs and the Class for statutory damages, attorneys' fees, and

23  costs for this claim under 15 U.S.C. § 1693m.

24

25

26

27

28  [21] Consumers have a private right of action for violations of Regulation E. *See Lussoro v. Ocean Fin.*
   *Fed. Credit Union*, 456 F. Supp. 3d 474, 492 (E.D.N.Y. 2020).

**CLAIM 3**
**VIOLATION OF REGULATION E NOTICE REQUIREMENTS**
**15 U.S.C. § 1693c; 12 C.F.R. § 1005.7**
**On Behalf of All Notice Requirement Class Members**

97.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

98.     15 U.S.C. § 1693c and Regulation E, 12 C.F.R. § 1005.7, require all financial institutions to make the disclosures set forth in § 1005.7 before the first electronic fund transfer is made involving a consumer's account.

99.     Coinbase, a "financial institution," has violated Regulation E by failing to provide adequate initial disclosures to Plaintiffs and members of the Notice Requirement Class including, as applicable:

(1)     a summary of liability of Plaintiffs and the Class, under 12 CFR § 1005.6 or under state or other applicable law or agreement, for unauthorized electronic fund transfers;

(2)     the telephone number and address of the person or office to be notified when a Plaintiff of member of the Class believes that an unauthorized electronic fund transfer has been or may be made;

(3)     Coinbase's business days;

(4)     the type of electronic fund transfers that Plaintiffs and the Class may make and any limitations on the frequency and dollar amount of transfers;

(5)     any fees imposed by Coinbase for electronic fund transfers or for the right to make transfers;

(6)     a summary of the rights of Plaintiffs and the Class to receipts and periodic statements, as provided in 12 CFR § 1005.9 of this part, and to notices regarding preauthorized transfers as provided in 12 CFR § 1005.10(a) and (d);

(7)     a summary of the rights of Plaintiffs and the Class to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop-payment order, as provided in 12 CFR § 1005.10(c);

1    (8)     a summary of Coinbase's liability to Plaintiffs and the Class for failure to make

2    or to stop certain transfers;

3    (9)     the circumstances under which, in the ordinary course of business, Coinbase

4    may provide information to third parties concerning the Coinbase accounts of Plaintiffs and

5    the Class;

6    (10)     A notice that is substantially similar to Model Form A-3 as set out in Appendix

7    A of 12 CFR §§ 1005.1 *et seq.* concerning error resolution; and

8    (11)     a notice that a fee may be imposed by an automated teller machine operator as

9    defined in 12 CFR § 1005.16(a), when a Plaintiff or member of the Class initiates an electronic

10    fund transfer or makes a balance inquiry, and by any network used to complete the transaction.

11    100.    As a result of Coinbase's violation of the notice requirements of 15 U.S.C. § 1693c and

12    Regulation E, Plaintiffs and the Notice Requirement Class are entitled to statutory damages, attorneys'

13    fees, and costs for this claim under 15 U.S.C. § 1963m(a).

14    **CLAIM 4**
**NEGLIGENCE**
15    **On Behalf of All Class Members**

16    101.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth

17    herein.

18    102.    Coinbase owed a duty of reasonable care toward Plaintiffs and the Class based upon

19    Coinbase's relationship to them.

20    103.    Coinbase breached this duty by negligently, carelessly, and recklessly collecting,

21    maintaining, and controlling its customers' funds and cryptocurrency and by failing to protect them

22    from exposure to unauthorized third parties.

23    104.    As a direct and foreseeable consequence of Coinbase's breach of its duty of care,

24    Plaintiffs and the Class were injured and are entitled to damages available by law in an amount to be

25    proven at trial.

26

27

28

**CLAIM 5**
**NEGLIGENT MISREPRESENTATION**
**On Behalf of All Class Members**

105.   Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

106.   Coinbase represented to Plaintiff and the Class, through its statements and categorizations, that it offered a safe and secure platform for the exchange and storage of funds, cryptocurrency, and other assets.

107.   Coinbase failed to conduct a reasonable and diligent investigation of the representations it made to Plaintiffs and the Class to ensure that those statements were true and that there was no omission of material facts required to make the representations not misleading. Coinbase, in the exercise of reasonable care, should have known its statements and omissions were misleading.

108.   Coinbase owed a duty to Plaintiffs and the Class to speak with care and explain fully and truthfully all material facts regarding the security of their Coinbase accounts and the availability and methods of remediating errors in electronic transfers. This duty arose from several bases under state and federal law, including Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "deceptive acts or practices in or affecting commerce." This provision encompasses material representations, omissions, or practices that are likely to mislead a reasonable consumer.

109.   Coinbase's duty to speak with care arose from its relationship with Plaintiffs and the Class and its unique position in the cryptocurrency market. Because of its critical role within the cryptocurrency exchange market, Coinbase was in a superior position to protect against the harm suffered by Plaintiffs and the Class.

110.   The relationship between Coinbase and Plaintiffs and the Class is such that, in morals and good conscience, Plaintiffs and the Class had the right to rely upon Coinbase for information. Coinbase was in a special position of confidence and trust with Plaintiffs and the Class such that their reliance on Coinbase's negligent misrepresentations was justified.

111.   Coinbase knew, or reasonably should have known, that Plaintiffs and the Class would rely on its misrepresentations and omissions in using the Coinbase platform and exchange for the transfer and storage of funds, assets, and cryptocurrencies.

112.     Coinbase's negligent misrepresentations and omissions, upon which Plaintiffs and the Class reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and the Class to use the Coinbase platform and exchange for the transfer and storage of funds, assets, and cryptocurrencies.

113.     As a direct and proximate cause of their reliance on Coinbase's representations, Plaintiffs and the Class have been injured and are entitled to damages available by law in an amount to be proven at trial.

**CLAIM 6**
**BAILMENT**
**Common Law and Cal. Civ. Code §§ 1813 *et seq.***
**On Behalf of All Class Members**

114.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

115.     Plaintiffs and the Class deposited funds and cryptocurrencies into their Coinbase accounts in order to use, store, keep, sell, trade, or exchange cryptocurrencies.

116.     Plaintiffs and the Class gave consideration for the funds and cryptocurrencies deposited with Coinbase in the form of commissions and fees.

117.     Coinbase is a bailee of the personal property of Plaintiffs and the Class. Plaintiffs and the Class are bailors of their personal property.

118.     As a bailee, Coinbase had an obligation to return or account for the deposited personal property upon demand.

119.     By its own acts or omissions, Coinbase caused the personal property deposited by Plaintiffs and the Class to be lost.

120.     Coinbase has refused to return the personal property deposited by Plaintiffs and the Class.

121.     Coinbase has refused to provide complete disclosure to Plaintiffs and the Class regarding the circumstances under which the loss of property occurred. As a result, Coinbase is presumed to have willfully, or by gross negligence, permitted the loss or injury to occur pursuant to Cal. Civ. Code § 1838.

122.     As a result of Coinbase's failure to fulfill its obligations and duties as a bailee, Plaintiffs and the Class have been injured because they are deprived of their personal property.

**CLAIM 7**
**VIOLATION OF CALIFORNIA UNIFORM COMMERCIAL CODE DIVISION 8**
**Cal. Comm. Code § 8507(b)**
**On Behalf of All Class Members**

123.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

124.     Coinbase characterizes itself as a "securities intermediary" and characterizes Coinbase wallets as "financial assets," which are subject to Division 8 of the California Uniform Commercial Code ("UCC").

125.     Under UCC § 8102(a)(7), the owner of assets held in an account with a securities intermediary is an "entitlement holder."

126.     If Coinbase's characterization of the relationship is correct, at the time of the unauthorized transfers alleged herein, Plaintiffs and the Class were "entitlement holders" with respect to the assets held in their Coinbase accounts.

127.     Under UCC § 8102(a)(8), an order for a securities intermediary to transfer assets is an "entitlement order."

128.     Under UCC § 8107(b), an entitlement order is only "effective" if it is made by the entitlement holder or an authorized agent or ratified by the entitlement holder.

129.     The orders for the unauthorized transfers from the Coinbase accounts of Plaintiffs and the Class, as alleged herein, were not effective because they were not made by Plaintiffs or the Class or by their authorized agents, nor were they ratified by Plaintiffs or the Class.

130.     Nonetheless, Coinbase completed those unauthorized transfers even though they were made pursuant to ineffective entitlement orders.

131.     Pursuant to UCC § 8507(b), Coinbase is obligated to credit the Coinbase accounts of Plaintiffs and the Class to correct the unauthorized transfers and to pay or credit any payments or distributions that Plaintiffs and the Class did not receive as a result of the wrongful transfers, in addition to liability for damages.

132.     As a direct and foreseeable consequence of Coinbase's transfer of the assets of Plaintiffs and the Class pursuant to ineffective and invalid entitlement orders, and of Coinbase's failure to credit the Coinbase accounts of Plaintiffs and the Class to correct those unauthorized transfers, Plaintiffs and the Class were injured.

### CLAIM 8
### VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT
#### Cal. Civ. Code §§ 1750 *et seq.*
#### On Behalf of All Class Members

133.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

134.     At all relevant times, Plaintiffs and the Class were "consumers" under the terms of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, as individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

135.     Coinbase's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA. The assets involved in the unauthorized transactions are "goods" and Coinbase's financial and online platform services are "services" under the CLRA.

136.     Coinbase violated the CLRA by, among other things, making false statements and omitting truthful information about its services and including unconscionable and/or unlawful provisions in its contracts with Plaintiffs and the Class.

137.     Coinbase's misrepresentations were material. Coinbase's violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to use Coinbase's services.

138.     As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

139.     Coinbase's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class and refused to remedy the breach of its platform and exchange long after learning of the inadequacy of its data protection and security measures and of the unauthorized access and use of its customers' accounts.

**CLAIM 9**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**On Behalf of All Class Members**

140.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

141.     Coinbase and Plaintiffs and the Class are "persons" within the meaning of the California Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code § 17201.

142.     Coinbase engaged in unlawful, fraudulent, and/or unfair conduct that is harmful and deceiving to consumers within the meaning of the UCL.

143.     Plaintiffs and the Class suffered injuries in fact and lost money or property as a result of Coinbase's violations of the UCL.

144.     Coinbase's conduct is substantially injurious to consumers, offends legislatively-declared public policy as announced by the violations of the laws alleged, and is immoral, unethical, oppressive, and unscrupulous. The gravity of Coinbase's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Coinbase's legitimate business interests other than engaging in this wrongful conduct.

**CLAIM 10**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201 *et seq.***
**On Behalf of All Florida Subclass Members**

145.     Plaintiff Abraham Bielski repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

146.     Plaintiff Abraham Bielski and the Florida Subclass are "consumers" and "persons" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. §§ 501.203, 501.211.

147.     Coinbase advertised, offered, or sold goods or services in Florida and engaged in commerce affecting Florida residents, including Plaintiff Abraham Bielski and the Florida Subclass.

148.     Coinbase engaged in unconscionable acts or practices, and in unfair or deceptive acts or practices, in the conduct of its business and operation of the Coinbase platform and exchange. These acts or practices included, among other things, making false statements and omitting truthful

1  information about Coinbase's services and including unconscionable and/or unlawful provisions in

2  its contracts with Plaintiff Abraham Bielski and the Florida Subclass.

3       149.    Coinbase's misrepresentations and omissions were material because they were

4  reasonably likely to deceive reasonable consumers about the adequacy of Coinbase's safety and

5  security measures and its compliance with laws and standards relating to financial account security and

6  the correction of errors relating thereto.

7       150.    Plaintiff Abraham Bielski and the Florida Subclass acted reasonably in relying on the

8  misrepresentations and omissions of Coinbase and could not reasonably have uncovered the falsity of

9  those misrepresentations and omissions.

10       151.    Plaintiff Abraham Bielski and the Florida Subclass suffered actual damages and lost

11  money or property as a direct and proximate result of Coinbase's violations of FDUTPA.

12       152.    Had Coinbase disclosed to Plaintiff Abraham Bielski and the Florida Subclass its actual

13  safety and security standards for their accounts, and/or its refusal to make them whole if they were to

14  fall victim to unauthorized electronic fund transfers out of their accounts, Plaintiff Abraham Bielski

15  and the Florida Subclass would not have provided funds, cryptocurrency, or other assets to Coinbase

16  for storage on the Coinbase platform and would not have used the Coinbase exchange for the transfer

17  of funds, cryptocurrency, or other assets.

18       153.    Plaintiff Abraham Bielski and the Florida Subclass seek all monetary and equitable

19  relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.211, declaratory and

20  injunctive relief, attorneys' fees and costs pursuant to Fla. Stat. § 501.2105(1), and any other relief

21  available under FDUTPA.

22  **CLAIM 11**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
23  <u>**On Behalf of All New York Subclass Members**</u>

24       154.    Plaintiff Dzhura Binyaminov repeats and realleges the allegations of the paragraphs

25  above as if fully set forth herein.

26       155.    Plaintiff Dzhura Binyaminov and the New York Subclass are persons within the

27  meaning of N.Y. Gen. Bus. § 349(g).

28

1    156.    Coinbase is a person, firm, corporation, or association within the meaning of N.Y.

2    Gen. Bus. § 349(b).

3    157.    Coinbase engaged in deceptive acts and practices in the conduct of business, trade,

4    and commerce by, among other things, making false statements and omitting truthful information

5    about Coinbase's services and including unconscionable and/or unlawful provisions in its contracts

6    with Plaintiff Dzhura Binyaminov and the New York Subclass.

7    158.    A reasonable consumer would be misled by these deceptive acts and practices.

8    159.    These deceptive acts and practices were consumer-oriented.

9    160.    These deceptive acts and practices as to Plaintiff Dzhura Binyaminov and the New

10   York Subclass occurred in New York. The New York Department of Financial Services issued

11   Coinbase a New York Money Transmitter License and a New York Virtual Currency Business Activity

12   Company License to regulate its activities in New York. Thus, New York has a significant interest in

13   enforcing its consumer protection statutes, including New York General Business Law § 349.

14   161.    Plaintiff Dzhura Binyaminov and the New York Subclass were injured as a direct and

15   proximate result of Coinbase's deceptive acts and practices because they lost access to and control

16   over their funds, cryptocurrency, or other assets.

17   162.    Plaintiff Dzhura Binyaminov and the New York Subclass are entitled to injunctive

18   relief and to actual damages or $50 per violation, at their individual elections, because of Coinbase's

19   deceptive acts and practices. *See* N.Y. Gen. Bus. § 349(h). Plaintiff Dzhura Binyaminov and the New

20   York Subclass are also entitled to treble damages, because Coinbase's actions were willful and

21   knowing.

22   163.    Plaintiff Dzhura Binyaminov and the New York Subclass are entitled to reasonable

23   costs and attorneys' fees. *See* N.Y. Gen. Bus. § 349(h).

24                                   **CLAIM 12**
                                **UNJUST ENRICHMENT**
25                            <u>**On Behalf of All Class Members**</u>

26   164.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth

27   herein.

28

---

165.    Plaintiffs and the Class conferred a benefit upon Coinbase through depositing funds and cryptocurrencies into their Coinbase accounts, and they paid Coinbase commissions and fees to maintain those funds and cryptocurrencies and to process transactions conducted on the Coinbase platform.

166.    As a result of Coinbase's actions and omissions as alleged herein, Coinbase has been unjustly enriched at the expense of Plaintiffs and the Class. Under principles of equity, Coinbase should not be allowed to retain the commissions and fees paid to it by Plaintiffs and the Class, and Coinbase should not be allowed to retain the funds and assets held within Plaintiffs' and the Class's Coinbase accounts.

167.    Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

a.      Compensatory damages;

b.      Statutory damages;

c.      Treble damages;

d.      Restitution;

e.      Disgorgement;

f.      Punitive damages;

g.      Attorneys' fees and costs;

h.      Pre- and post-judgment interest, as applicable; and

i.      All further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby respectfully demand a trial by jury on all claims.

Date: November 28, 2022

 */s/ Hassan A. Zavareei*

Hassan A. Zavareei (State Bar No. 181547)
*hzavareei@tzlegal.com*
Spencer S. Hughes (appearance *pro hac vice*)
*shughes@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
Wesley M. Griffith (State Bar No. 286390)
*wgriffith@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

Matthew D. Carlson (State Bar No. 273242)
*mdcarlson@mdcarlsonlaw.com*
**LAW OFFICE OF MATTHEW D. CARLSON**
3959 North Buffalo Road, Suite 29
Orchard Park, New York 14127
Telephone: (716) 242-1234

*Counsel for Plaintiffs Abraham Bielski, Dzhura*
*Binyaminov, and Auryan Sajjadi*